JOSEPHINE HEFFERIN,
*Plaintiff 'and Appellant,*

vs.

SCOTT REALTY COMPANY,
*Defendant and Respondent.*

(No. 2577; March 10th, 1953; 254 Pac. (2d) 194)

For the plaintiff and appellant the cause was submitted upon the brief of Mahoney and Wilkerson of Casper, Wyoming, and oral argument by Mr. Ernest Wilkerson.

For the defendant and respondent the cause was

submitted upon the brief and also oral argument of William T. Schwartz of Casper, Wyoming.

## OPINION

BLUME, Chief Justice.

In this case the plaintiff sued the Northern Utilities Company and the Scott Realty Company for damages sustained while plaintiff was conducting a restaurant called the Copper Kettle at 349 East "A" Street, in the city of Casper, Wyoming. The Utilities Company was sued for not properly fixing gas leaks in the restaurant. The Scott Realty Company was sued for not furnishing proper ventilation in the kitchen. The case was tried to a jury which returned a verdict in favor of the Utilities Company. No appeal has been taken so far as it is concerned. The jury brought in a verdict against the Scott Realty Company, fixing plaintiff's damages at $1,688.50. Prior to the submission of the case to the jury' and at the close of the evidence in the case, the Scott Realty Company made a motion for a directed verdict. That motion was overruled. And after the verdict, the same company made a motion for judgment notwithstanding the verdict as permitted by Section 3-3605, W.C.S. 1945. That motion was sustained and judgment was entered in favor of the defendant, Scott Realty Company. Thereupon the plaintiff appealed to this court.

When the term defendant is used herein it will refer to the Scott Realty Company, the landlord herein, and the plaintiff will be designated as in the court below.

We may to a large extent follow the brief of counsel for plaintiff in stating the pleadings herein as far as defendant is concerned as follows: The plaintiff alleged that for valuable consideration paid to defendant she entered into possession of premises owned by defendant to operate a restaurant; 'that very shortly after commencing operations, lighting the gas burners, etc., it became apparent to plaintiff that there

were inadequate ventilation facilities in the restaurant and that she could not continue under such circumstances to operate, whereupon she closed the business. The defendant, acting through its president and duly constituted agent, then requested plaintiff to re-open and assured her that defendant would fix the ventilating system. Plaintiff did re-open and defendant, after some delay, made an abortive effort to better the ventilation. After the defendant had finished its ventilating system renovation, which plaintiff says was of no value, plaintiff was stricken with acute bronchiolitis and pericarditis which she alleges was the result of the gas fumes and lack of oxygen in the restaurant. Defendant Scott Realty Company admitted that it was notified of poor ventilation, admitted that it undertook repairs to the ventilating system, denied that it had any obligation to do so; alleged that the obligation, if any, was on plaintiff to repair the ventilating facilities, and that plaintiff assumed the risk by continuing to operate the restaurant.

Though hardly necessary to set out many facts, as will appear hereafter, we thought it advisable to set out sufficient to show the main facts and the contentions in that connection, so that it may not be thought that we have overlooked what counsel for plaintiff considers the kernel of the case.

Plaintiff and defendant entered into a contract with reference to conducting the restaurant about February 28, 1951, the terms of which were reduced to writing, although the instrument was not in fact signed. The lease was for a definite period of three years and contained no provisions with reference to making repairs on the part of the landlord. The restaurant was being cleaned between February 28 and March 5, and was opened on the latter date. One Peebles, inspector for plumbing, gas and sewer, inspected the premises on

March 3, 1951, and made his report stating that there was a sufficient fresh air inlet. The restaurant had been conducted previously by another party and no trouble as to ventilation had been experienced during that time. A dining room had then been used in connection with the restaurant. Plaintiff, however, did not desire this room although it was offered to her on the part of the defendant. That room accordingly was shut off, and the lack of ventilation in the kitchen subsequently was apparently due to that fact. About March 9, plaintiff considered the kitchen to be so hot and suffocating as to prevent her from continuing to conduct the restaurant until some more ventilation was furnished. So she shut down for a day or two, interviewing the manager of the defendant who stated that he would see what he could do. A new ventilating system was thereafter installed in the kitchen at the cost of more than $400. J. E. Scott, manager of the defendant, testified as follows: (Q. 768)

"Q. Will you describe the installation? A. Well, it has three ducts along the ceiling that brings this fresh air and you can hold your hand up and you could feel the fresh air coming in any place along these ducts.

"Q. Where does the air go out? A. It goes out through the door and the chimney—the stove had a ventilator on it and this air pulls out this ventilator and goes out through the roof. There are two fans— one takes the air out and one takes the air in.

"Q. Did you talk with Mrs. Hefferin after the installation? A. I did.

"Q. What was her opinion about the installation? A. She made the remark to me that it had helped so much. If we would put in another duct in near the stove she thought it would be all right."

The additional duct was thereafter installed. The installation was made by one Bert Peters, a carpenter foreman, and by Vern Williams, foreman of a tin and metal shop. Williams testified that the system worked "pretty good". Peters testified that the system worked very satisfactory. On the other hand the witness Marie Beall testified that the kitchen was very hot and that so far as the heat was concerned there was no difference between the time that the restaurant opened and the time that it closed about March 27, 1951. And the plaintiff testified (Q. 562) : "I didn't realize what was going on or what was happening to me until I went out to get air, and then I could smell the fumes. It was the heat and gas together which would make anyone, any normal person sick.

"Q. You stated that the man (from the White Sheet Metal Co.) could not work because of the presence of gas there? A. He was working around the French frier and said he couldn't stand the heat there to work and didn't know how I could stay in there and work.

"Q. You testified that it was impossible to breathe because of the intense heat. Why was that? A. It was too, hot in there and so smoky you couldn't see. There was many a time I had to open the icebox and stick my head in there to get some fresh air."

Plaintiff worked at the restaurant from four o'clock in the morning until eight o'clock at night with a little time off in the afternoon. She was a woman 45 to 50 years of age and Dr. McClelland testified that he considered it humanly impossible for her, in her condition, to, work that long.

Plaintiff got sick on March 24 or 25, 1951, and was taken to the hospital where she remained for a number of days. She was treated for bronchiolitis and

heart trouble. Dr. Roberts testified: "It was my opinion at that time, that it was probably a toxic condition based on her history at that time resulting from her working in a place which she states had insufficient ventilation and she was bothered by the odor of gas." In his opinion the indirect result was "inhalation of toxic fumes". He considered that her heart condition was brought about over a period of years but that the bronchiolitis was brought about over a period of weeks.

Counsel for plaintiff argues that the installation of the new ventilation system by the defendant was ineffectual. Peters testified that he drilled two holes in the wall, one on top, one at the bottom, for the air to circulate; that the bottom one was for the outlet of the hot air, the top for the inlet of fresh air. So counsel say that in view of the fact that hot air rises to the top, the installation was almost a childish error. The details of the installation are not sufficiently clear in the record before us. Possibly Peters was confused. Defendant was perhaps unfortunate in its selection of parties to make the installation, and should have selected men with greater experience, if available, although it would seem that a foreman carpenter ought to have had sufficient knowledge so as to install a ventilation system that would work. However that may be, the system was installed at an expense of more than $400. The landlord in this case apparently did the best it could or knew how to do within the rather limited time at its disposal. No fraud, no misrepresentation, oppression or other tortious conduct on the part of the landlord appears in the record, and so the question arises as to the legal liability of the landlord under the facts herein. We agree with counsel that: "In determining whether to render a judgment non obstante veredicto, the court is not justified in

trespassing on the province of the jury to be the judges of all questions of fact in the case, and the party favored by the verdict is entitled to have the testimony read in the light most advantageous to him, and to be given the benefit of every inference of fact fairly deductible therefrom." 30 Am. Jur. § 57, p. 849. The testimony shows that the kitchen had some twelve burners, and the ordinary kitchen, including a restaurant kitchen, especially one without doors and windows as was true in this case, would of course be hot under ordinary circumstances whether it had a special ventilating system or not. However, if this case depended on the question of the sufficiency of the evidence as to whether or not the kitchen was *extraordinarily* hot without a proper ventilating system so as to be the cause of plaintiff's subsequent sickness, there was probably sufficient evidence, though conflicting, to show that it was; hence that question would have been one for the jury. But the case does not depend on that as we shall proceed to show.

As heretofore stated the lease in this case contained no covenant to repair. It is stated in 32 Am. Jur. § 657, p. 521: "In the absence of an agreement to the contrary, the landlord is not obligated to make repairs upon the demised premises during the term either to put the premises in repair or to keep them in such condition. The landlord is not bound to repair defects in the demised premises existing at the time he leased the same or occurring thereafter from any cause other than the act of the landlord." So it is said in 51 C.J.S. 1073, 1074: "There is no implied covenant that the lessor will make any repairs to the demised premises during the term, even if the premises are in a dangerous condition, * * * " As a corollary to the foregoing rule, it is stated in 32 Am. Jur. § 662, p. 526, as follows: "The logical conclusion from the

principle that the landlord is under no implied obligation as to the condition of the demised premises or as to the repair of defects therein is that the landlord is not responsible to the tenant for injuries to person or property caused by defects in the demised premises where the landlord has not made any warranty or contract as to the condition of the demised premises or as to the repair of defects and is guilty of no wilful wrong or fraud." To a like effect see Restatement of the Law of Torts, section 355 and subsequent sections.

In this case plaintiff does not rely upon any contract contained in the lease between the parties but asserts that the defendant was liable under the promise which it made on or about March 9, 1951, to install a new ventilation system. There was no new consideration for any such promise or contract. It has been held that "when the relation of the parties is such that the tenant is not bound to continue the tenancy, the promise of the landlord to make repairs if the tenancy is continued is based on a sufficient consideration * * *." 51 C.J.S. 1085. In the case at bar, however, the lease was for a definite term of three years, and hence the foregoing statement does not apply. The rule applicable here is that stated in 51 C.J.S. 1084: "A contract or covenant to repair must be supported by a consideration * * * a promise of repair, made by a landlord to his tenant during the tenancy, with no other consideration than such tenancy, is a nudum pactum, without consideration, and cannot be enforced." Numerous authorities are cited, among them the case of Grace v. Williams, 36 Ohio. App. 569, 173 N.E. 448, in which the court stated: "Two rules of law are involved: First, the landlord is under no obligation to repair premises if he has not covenanted to do so. 16 Ruling Case Law, 1030, Section 552; Goodall v. Deters, 121 Ohio St., 432, 169 N.E. 443. Second,

the promise to make repairs during tenancy must be supported by a new consideration. 16 Ruling Case Law, 1033, Section 553: 'It has frequently been held that the landlord is under no obligation to make repairs, unless such a stipulation is made a part of the original contract, and that any subsequent promise to make repairs, founded merely on the relation of the parties, and not one of the conditions of the lease, is without consideration, and for that reason creates no liability.' " And so it is said in 32 Am. Jur. § 730, p. 604: "An obligation on the part of a landlord to make improvements on the demised premises may arise from a subsequent agreement with his tenant provided such agreement is supported by a consideration, but a subsequent promise, if not supported by consideration, is considered a nudum pactum, even though the improvement may benefit the reversionary interest." In the case at bar, the promise made by the landlord herein was wholly gratuitous and was not binding upon it and it follows from what has been said that the judgment of the trial court must be affirmed and it is not necessary to consider the other questions raised by the defendant herein.

Affirmed.

RINER, J., concurs. ILSLEY, J., concurred before his death.