Irene CIMOLI, Appellant (Plaintiff below),

v.

GREYHOUND CORPORATION and J. C. Cagle, Appellees (Defendants below),

and

United States Rubber Company (Defendant below).

No. 3059.

Supreme Court of Wyoming.

June 18, 1962.

Reearing Denied Sept. 12, 1962.

R. R. Bostwick, of Murane, Bostwick & McDaniel, Casper, for appellant.

Walter B. Phelan, of Guy & Phelan, Cheyenne, for appellees.

Before PARKER, HARNSBERGER, and McINTYRE, JJ.

Mr. Justice PARKER delivered the opinion of the court.

On May 10, 1955, a collision occurred on Highway 30, some two miles west of Rawlins, between an automobile driven by Irene Cimoli and a Greyhound bus driven by J. C. Cagle. As a result, two separate civil cases were commenced. In the first, a bus passenger brought an action against Mr. and Mrs. Cimoli, the Greyhound Corporation, J. C. Cagle, and the United States Rubber Company. The Cimolis cross-claimed against Greyhound, Cagle, and U.

S. Rubber for the loss of the automobile, injuries to their two minor children and Mrs. Cimoli, and certain other damage. Subsequently, due to negotiations and settlements, the bus passenger was removed as a litigant and only the cross-claims were left to be litigated. In the second case, Greyhound sued the Cimolis who counterclaimed. These causes on October 17, 1960, proceeded to trial as if the parties to the action were Irene Cimoli, plaintiff, and the Greyhound Corporation, Cagle, and the U. S. Rubber Company, defendants. The damages to the bus, car, and personal items, as well as the doctor and hospital bills, were stipulated.

Defendants each moved for a directed verdict at the conclusion of plaintiff's evidence and again after the taking of testimony had been concluded, but the motions were overruled. The jury returned two verdicts, (1) in favor of the U. S. Rubber Company and against plaintiff, and (2) in favor of plaintiff and against Greyhound and Cagle as follows:

| | |
|---|---|
| Loss of car | $2,453.58 |
| Loss of personal property | 822.35 |
| Doctor and hospital expense | 162.00 |
| General damages | 12,500.00 |

On November 3, 1960, the court entered a judgment on the verdicts. Greyhound and Cagle under the provisions of Rule 50(b), Wyoming Rules of Civil Procedure, filed a motion for judgment notwithstanding the verdict, alleging that the evidence was insufficient to present a jury question, the verdict was not supported by substantial evidence, and plaintiff had failed to sustain the burden of proof. On April 26, 1961, the court granted the motion, entering judgment for Greyhound and Cagle, defendants, against Cimoli, plaintiff. (The parties will be so designated hereafter.) Fundamentally the appeal presents a single question, Was there substantial evidence upon which the jury's verdict for plaintiff and against the defendants could be based?

As is stated in 2B, Barron and Holtzoff, Federal Practice and Procedure, p. 413 (1961), cited by defendants, "The court has power to enter judgment notwithstanding the verdict only for one reason—the absence of any substantial evidence to support the verdict." Defendants state their position, "Viewing the evidence in the light most favorable to appellant, what negligence, if any, was the real cause of the damages?" It therefore becomes of primary interest to define the word "negligence."

Plaintiff relies upon Hildebrand v. Chicago, B. & Q. R. R., 45 Wyo. 175, 17 P.2d 651, 658, for a definition of negligence, "'the failure to observe, for the protection of the interests of another person, that degree of care, precaution and vigilance which the circumstances justly demand, whereby such other person suffers injury.'" Defendants submit their version, "[negligence is] the want of due care, that is, such care as the ordinary, prudent person would exercise under like circumstances. It is the doing of something which a person of ordinary prudence and care would not have done under like or similar circumstances; or it may be the failure to do something that a person of ordinary prudence or care would have done under similar circumstances. Negligence might also be defined as the failure to observe for the protection of the interest of others, that degree of care, precaution and judgment which the circumstances justly demand." Although neither definition may be all inclusive, either statement is sufficient for the purposes of this case. We therefore review the evidence as disclosed by the record.

Irene Cimoli testified that at the time of the accident her automobile was comparatively new. She had driven it only 900 miles before leaving San Francisco for the trip east. Just before she reached a small bridge on Highway 30, some two miles west of Rawlins at about 2:20 p. m., her right rear tire blew out. Not knowing what had happened, she applied some pressure on the brake, then realized the trouble must be a bad tire, took her "foot off and

was trying to just ride it out" to see if she couldn't bring the car under control; it was shimmying badly. She was on the left hand side of the road at various times during the trouble. She said she was trying to control the automobile and saw the bus only a few seconds before the impact. After her car had gone some distance, which later witnesses testified as being between six and seven hundred feet, it turned suddenly to her left and the vehicles collided.

With Cagle, a student driver on his first run, was a regular driver who immediately prior to the crash had been interviewing a passenger on the upper tier of the bus. He was returning to his seat just before the impact. He testified:

"Well, when we finished talking, I turned around and started down, and just as I started down, I noticed a car coming diagonally across the road towards the bus, so, all I done was I grabbed onto a seat, and of course, I knew there was going to be a crash. Well, at this time, Johnny Cagle had slowed down to, I would say approximately 30 to 35 miles an hour * * *."

Cagle said he was going westerly about two miles out of Rawlins at about fifty miles per hour when as he topped a rise he saw a car in the vicinity of a bridge some six or seven hundred feet away.

"* * * I noticed the car as it approached the bridge or in the vicinity of the bridge that it appeared to be about the center of the highway, and at that instant it straightened up and in its lane * * *. It could have been on the line, but never over * * *."

He said that during the time he saw the car coming he applied the brakes lightly, reduced speed to about thirty-five miles an hour, and remained at that speed.

"* * * when I applied the brakes the first time there was a thought that went in my mind there might be something wrong with that car because it was starting to pull to the right, to the

right of the highway; and which was a side scene there in the highway that a car could pull over and park. That's when I applied the brakes the first time."

Photographs and charts were introduced in evidence and they, as well as the testimony, disclosed numerous circumstances which are undisputed. The physical facts indicate that the impact was between the right side of the car and the left front corner of the bus. The car was spun around by the bus and remained across the highway with the major part on its own side of the road. The skid marks of the bus immediately prior to the crash measured 79' 6", most of which skid was on the pavement. The tire marks showed that the right wheel of the bus was off the blacktop at the time of the crash, the left some 8' 10" to the right of the center line, and that the vehicle thereafter proceeded in a forward direction over a comparatively level portion of the borrow pit for 228' 6" before it stopped.

Various photographs purporting to show the tracks made by the Cimoli automobile indicated that her left wheels had been across the center line during the time that the car was coming from the bridge to the point of the impact. According to the diagrams, when the Cimoli car was a thousand feet from the scene of the accident the right rear tire was 6' 5" to the right of the center line which would throw the left wheels over the center of the road. Thereafter it swerved to the left until at a point approximately 450' from the crash the right wheel was practically on the center line. It then turned gradually in an irregular pattern to the right until at a point approximately 120' from the place where the vehicles collided the right wheel was almost off the right side of the pavement, whereupon it swerved abruptly to the left toward the bus.

A passenger sitting diagonally from the driver, said she saw the car coming pretty fast and that the bus was then going thirty to thirty-five miles per hour and the car "coming down the road when I seen

it * * * was going back and forth like it was out of control."

Another passenger, who was sitting the third seat back from the front, testified:

"I saw this car coming across over, and then I saw it go back again to the other side. I thought 'Oh, God, I hope she stays there.' * * * and just as I was hoping, it came back."

In answer to a question as to the first time she saw the car, she said:

"Well, it was just coming across over toward our lane. * * * Then it moved again over to the other side."

The evidence disclosed that the blowout was of a comparatively new tire which Mrs. Cimoli had no reason to believe would be susceptible to that difficulty, that she was going between fifty and sixty miles per hour prior to the accident, attempted to put on the brakes lightly, found that this was not successful, attempted to hold the car on her side of the road, was unable to do so, and swerved onto the left side of the highway. Under the evidence presented in the case, the jury was entitled to believe that Cagle, the bus driver, at a distance of some 900′ saw a car having difficulty of a nature which would place a reasonable man under some apprehension. His statement that he thought the driver might be intending to park was a plausible excuse for not stopping, but the jury might or might not have believed this. The evidence is uncontradicted that he slowed the bus prior to the time of the final sudden swerve of the automobile, but that he was driving at thirty or thirty-five miles per hour until he applied his brakes sharply 79′ 6″ from the point of impact.

■ In Hefferin v. Scott Realty Co., 71 Wyo. 114, 254 P.2d 194, approved in Boyce v. Northern Utilities Company, 75 Wyo. 500, 297 P.2d 820, we noted that in determining whether to render a judgment notwithstanding the verdict the trial court is not justified in trespassing upon the province of the jury to be the judge of questions of fact in a case and that the party favored by the verdict is entitled to have the testimony read in the light most advantageous to him, being given the benefit of every inference of fact fairly deducible therefrom. It is well settled that the credibility of witnesses and the weight of their testimony are for the jury alone to determine, Chandler v. Dugan, 70 Wyo. 439, 251 P.2d 580, and that a question of fact must be passed upon by the jury, and a question of law determined by the court, Boswell v. First Nat. Bank of Laramie, 16 Wyo. 161, 92 P. 624, 93 P. 661.

■ Plaintiff observes that since the trial court's order setting aside the verdict did not explain the basis therefor it can only be assumed that the theory was of insufficient evidence to prove defendants guilty of negligence or that there was contributory negligence on the part of the plaintiff. Defendants' argument is similar, that the real cause of the accident was plaintiff's inability to control the car at the speed she was going and that the driver of the bus was not negligent because he failed to stop when he first saw the approaching automobile on the wrong side of the highway but exercised reasonable care in acting as he did. As to any negligence of Cagle, the defendants quote from O'Mally v. Eagan, 43 Wyo. 233, 2 P.2d 1063, 1068, 77 A.L.R. 582 (rehearing denied, O'Malley v. Eagan, 43 Wyo. 350, 5 P.2d 276, 77 A.L.R. 582):

"'A motorist has a right to presume that the driver of a vehicle coming from the opposite direction will obey the law, and to act upon such an assumption in determining his own manner of using the road; and a driver, therefore, proceeding on the right side of the traveled way, may assume that the driver of a vehicle approaching on the same side, or on his left side, will yield half the way, or will turn out in time to avoid a collision, *and not force him, in violation of the statute or ordinance, or the law of the road, to turn from the part of the road, on which he is lawfully driving, until he sees or ought to see, that such assumption is unwarranted.'* [1 Blashfield,

**174**

Cyclopedia of Automobile Law, p. 416.]" (Emphasis supplied by defendants.)

A general statement concerning the law applicable under similar circumstances is found in 2 Blashfield, Cyclopedia of Automobile Law and Practice, § 919 (perm. ed. 1951), the cases there considered, and Annotation, 47 A.L.R.2d 6. In the last analysis, the driver of a motor vehicle who is in his own lane of traffic and sees another vehicle coming toward him in the wrong lane has a duty to use ordinary care to avoid an impending collision and any assumptions which he makes as to the yielding of the right of way or the return of the vehicle to its proper lane must be reasonable in view of the circumstances. Although most of the cases discussed in the cited text and annotation deal with situations in which a motor vehicle remained on the wrong side of the road prior to a collision, we think the same principle is applicable to the situation before us. It was both the duty and prerogative of the finder of fact to determine whether or not Cagle acted as a reasonable man under all of the recited circumstances, including failure to stop or sharply check his vehicle if he observed or should have observed that the car was out of control at a time which would have permitted him to take steps to avert the crash.

Here the verdict of the jury was not permitted to stand, and we think that the trial court improperly invaded the jury's province.

█ It is argued that the trial court may have granted the motion for judgment notwithstanding the verdict because of plaintiff's contributory negligence, but the record does not disclose any basis for such a determination. We have defined contributory negligence as conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause, co-operating with the negligence of defendant in bringing about plaintiff's harm. Johnston v. Vukelic, 67 Wyo. 1, 213 P.2d 925, 930. It was the burden of Greyhound and Cagle to prove any contributory negligence which was claimed. Borzea v. Anselmi, 71 Wyo. 348, 258 P.2d 796; Johnston v. Vukelic, supra; Merback v. Blanchard, 56 Wyo. 152, 286, 105 P.2d 272, 109 P.2d 49. In the Borzea case, Chief Justice Blume took occasion to re-emphasize what he had said before in Templar v. Tongate, 71 Wyo. 148, 255 P.2d 223, 230: It is only in the clearest of cases where the facts are undisputed and it is plain that all intelligent men can draw but one inference from them that the question of negligence or contributory negligence is one of law for the court. Such rule applies to the litigation here before us. The question of negligence or contributory negligence under the circumstances was one depending upon fact and for the jury. The action of the trial court in setting aside its verdict was unwarranted; the judgment is reversed with directions to reinstate the verdict of the jury and the judgment previously entered therein on November 3, 1960.

Reversed and remanded with directions.

BLUME, C. J., not participating.