**Mark Charles NORLAND, a Minor, by and Through His Next Friend James N. Norland, James N. Norland, and Susan K. Norland, Husband and Wife, Plaintiffs-Appellants,**

v.

**WASHINGTON GENERAL HOSPITAL et al., Defendants-Appellees.**

No. 20536.

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1971.

Decided May 5, 1972.

Rehearing Denied June 6, 1972.

Samuel Langerman, Phoenix, Ariz., for plaintiffs-appellants.

W. W. Bassett, Jr., Fayetteville, Ark., for Empire Fire & Marine Ins. Co.

Richard B. Shaw, Fort Smith, Ark., for James D. Mashburn.

Before JOHNSON, VOGEL and ROSS, Circuit Judges.

PER CURIAM.

The appeal is by the plaintiffs in a diversity suit for malpractice under Arkansas law, brought by an infant through his father as next friend, and also by the father and mother in their own right. Recovery was sought against the obstetrician by whom the infant was delivered, against the hospital where the delivery occurred, and against the liability insurance carrier of the hospital (as permitted by Ark.Stat. 66–3240). The court granted dismissal of the action as to the hospital and its insurance carrier, and the jury returned a verdict in favor of the obstetrician.

The child's spinal cord was alleged to have been ruptured at a point between the eighth cervical and first thoracic vertebrae in the course of his delivery, and the injury was claimed to have been occasioned by the application of excessive force or traction in effecting emergence of his head. The head was the last part to have extraction, by virtue of the breech position which the fetus had occupied in the womb. Paralysis of the body from the chest down existed, causing the child to become a quadriplegiac.

Numerous contentions have been urged for reversal, most of which are without appellate merit. Thus the evidence, in our opinion, did not entitle the plaintiffs to a directed verdict or judgment notwithstanding the verdict on the questions of negligence and proximate cause. The obstetrician admitted generally on the stand that it would not constitute good medical practice for a doctor to apply such an extent of force or traction in delivery as would rupture a child's spinal cord, but he vigorously asserted that no such force or traction had been employed in the situation. He and the assisting nurse detailed the things which had been done, described the manner in which the passage of the head from the orifice had occurred, and testified to the absence of any problem or incident in the entire process, thus attempting to establish that the birth had been one of natural and normal breech delivery. The mother contradicted the testimony of the obstetrician and the nurse as to what had been done and what had occurred, and this conflict was a matter for resolution by the jury. Whether negligence had been involved was further made a question for the jury by some expert testimony that what the obstetrician testified to having done constituted proper and recognized medical practice in the locality and in similar communities as to the situation of breech delivery.

Nor can there be said to have been any abuse of discretion on the part of the trial judge in his refusal to put to the jury some voir dire questions which the plaintiffs requested, such as whether

the jury understood that the case was a civil and not a criminal one; that the obstetrician's license to practice was not in issue; and that the question was not whether the obstetrician was a capable doctor generally, but whether he had failed to measure up to the standards of proper practice in the particular instance. These questions did not go to the matter of fitness or qualification on the part of the members of the panel to serve as jurors, nor to the existence of capacity and willingness by them to decide the case solely on the evidence and the court's instructions. Rather the questions impress as being intended to have the court accord sanction to these side avenues and so open them up for use in subsequent argument.

Neither is there any basis for the charge made that "the climate and mood in which the trial was conducted, the conduct of the prevailing party, and the conduct of the court all joined to deprive the plaintiff of a fair trial". One aspect will suffice in example. The record reflects the exercise by Judge Miller throughout the proceedings of the usual calmness, restraint and fairness which have characterized the trials that have come before us during his many years on the bench. Thus the attack made against his reminder to plaintiffs' outside counsel from time to time, that counsel was continuing to engage in needless repetitions borders on the frivolous when viewed in the channel of the lengthy trial. Similarly, the record affords no sound basis to contend that an emotional display which occurred on the part of the obstetrician while he was on the stand had infected the trial. The court routinely and quietly declared a recess until the doctor regained his composure. The lack of any telling significance in the incident is attested by the fact that neither at the time, nor during the brief recess which was at once declared, did plaintiffs' counsel move for a mistrial. Moreover, this failure, beyond its contemporaneous indication of the lack of any occurring infection, itself left the plaintiffs without any right to engage in a present complaint.

Further, there cannot be held to be any error in the court's instruction that "The fact that Mark Norland sustained disability is not of itself evidence of negligence on the part of anyone * * * *". Arkansas accords no recognition to the doctrine of res ipsa loquitur as to the practice of medicine or surgery. Adams v. Heffington, 216 Ark. 534, 226 S.W.2d 352 (1950); Routen v. McGehee, 208 Ark. 501, 186 S.W. 2d 779 (1945). And as we have indicated, the testimony in its whole made the situation one where the question of negligence was for the jury.

We need not engage in a discussion of all of plaintiffs' other contentions. There are, however, a few which do present a substantial question in the situation. These primarily relate to the testimony of the defendant's expert witnesses. Attack is made against the probative competency of the opinions expressed by some of these witnesses on the nature and cause of the child's condition, as allegedly reflecting mere possibility and not probability in medical viewpoint on their part.

The use of the terms "probable" and "possible" as a basis for test of qualification or lack of qualification in respect to a medical opinion has frequently converted this aspect of a trial into a mere semantic ritual or hassle. The courts have come to recognize that the competency of a doctor's testimony cannot soundly be permitted to turn on a mechanical rule of law as to which of the two terms he has employed. Regardless of which term he may have used, if his testimony is such in nature and basis of hypothesis as to judicially impress that the opinion expressed represents his professional judgment as to the most likely one among the possible causes of the physical condition involved, the court is entitled to admit the opinion and leave its weight to the jury. In fact, it appears from some of the testi-

mony in the present record that the usual process for arriving at medical opinion is to engage in "diagnostic impressions" as to the possible causes and then to sift these down to the one that impresses as being the most likely possible one in the situation.

This, we believe, was the approach taken by the Arkansas Supreme Court to the question of possible and probable cause in American Life Ins. Co. v. Moore, 216 Ark. 44, 223 S.W.2d 1019 (1949). There a medical witness, a Dr. Munroe, expressed the opinion that the death involved had resulted from a pulmonary embolism occasioned by a leg fracture, but he "admitted the possibility that death was due to some other cause". An opposing medical witness testified that, on the basis of his own experience and the textbook materials existing in the field, it would be utterly impossible for the death to have been occasioned by an embolism from the fracture, since "an embolism never occurs more than three weeks after injury". The Court said that while "an autopsy would have been required to determine the cause of death with certainty", and although Dr. Munroe admitted that it was possible that the death was due to some other cause, "the effect of Dr. Munroe's testimony is that in his opinion the most probable cause of death was a pulmonary embolism attributable to the fractured leg" and that "We are unwilling to say that Dr. Munroe's testimony is conjectural merely because his opinion did not preclude every other possible cause of death". 223 S.W.2d at 1020–1021.

█ On what has been said, we hold that it was proper for the court to admit the testimony of Dr. Burnside and of Dr. Moore in its causal aspect, but that the testimony of Dr. Van Zant in this respect did not from its nature and extent rise above the level of the actual term employed by him—"a possible cause". Dr. Van Zant gave competent testimony on a number of other aspects of the controversy, and his intelligence and competence appeared to be such as to impress that in expressing the opinion that "precipitant labor" was "a possible cause" of the child's condition, he intended to say just that, and not that he regarded "precipitant labor" as necessarily being the most likely one among the possibilities in the situation. Thus his testimony could not be viewed as having sufficiently, on context or ingrediency, crossed the line between possible and probable medical cause.

█ Another aspect on which a substantial question exists goes to the basis on which the hypothetical questions were predicated. A hypothetical question must state all the facts upon which an expert witness is entitled to rely, and his opinion must be given wholly on the basis of the facts so hypothesized. Hulsizer v. Johnson-Breenan Const. Co., 232 Ark. 571, 339 S.W.2d 116 (1969); Arkansas Baking Co. v. Wyman, 185 Ark. 310, 47 S.W.2d 45, 57 (1932). If reference is made in a hypothetical question to some instrument or document, such as a deposition, the part thereof that is intended to constitute an element in the question must itself not only have been introduced in evidence, but must have such specific identification given to the particular facts therein which are meant to be incorporated as to make it clear beyond question that the jury has been informed of all the things upon which the answer of the witness is being based.

█ In the hypothetical question put to Dr. Kelsey to establish that in the things done in the defendant's delivery of the child he had conformed to the standards of practice and care followed and recognized by obstetrical practitioners in the local and similar communities, the witness was permitted to base his answer in part on some depositions to which reference was made; which had not been introduced in evidence but had been read by him; and the parts of which that he was permitted to or did take into account were not made known to the jury.

█ Enough has been said, we think, to indicate that a reversal is re-

quired. We take occasion to add that on a new trial we believe that appellants are entitled to somewhat more of an opportunity to go into the area of interest or bias on the part of Dr. Kelsey than they were afforded. Dr. Kelsey was the principal and perhaps the most forceful witness for the defendant. It was obvious from his testimony that he had engaged in a comprehensive study and thorough preparation as to the case. From the questions with which counsel for appellants began his cross-examination, it appeared that he was going to try to romp over as large an area as the court would permit him to do. After he had brought out that Dr. Kelsey and defendant's counsel were members of the same Country Club and had tried to go into what communications had occurred between them, and between Dr. Kelsey and the defendant, the court sustained defendant's objection to such questioning, saying, "I don't think it is necessary to go into all of that * * *". When counsel then asserted that he was entitled to "know [Dr. Kelsey's] full participation and how big it is in this case, how biased or unbiased it is", the court adhered to its previous ruling. But there nevertheless existed some legitimate area for appropriate interrogation in proper probe as to any possibly existing bias. That area should be allowed fair range in the new trial.

■ Clarification is also desirable on such trial as to the second paragraph of the court's instruction No. 7. This paragraph told the jury that in making application of the standard contained in the first paragraph of the instruction, as to when a physician would be guilty of professional negligence, "the only way you may properly learn that standard is through evidence presented in this trial by physicians qualified as expert witnesses, and you may consider only the evidence presented by these expert witnesses in deciding whether the defendant * * * applied the degree of skill and learning which the law required of him". It is argued that this in effect told the jury that it was required to ig-

nore the mother's testimony on what had occurred and what had been done in the delivery room. This arguably possible shadow can readily be eliminated through addition or clarification.

■ As to the part of the appeal taken from the dismissal of the hospital and its insurance carrier, that judgment is entitled to stand. The only possible proximateness that could exist in the relationship of the hospital to the child's injury would inhere in the acts of the nurse who assisted in the delivery. But the acts done by her in the delivery room and its processes were entirely subject to the direction and control of the obstetrician and thus made her as to the hospital, in her part of the delivery process, a "borrowed servant". Within that doctrine, there was under Arkansas law no liability on the part of the hospital to appellants for her actions. McElroy v. Employers Liability Assurance Corp., 163 F.Supp. 193 (W.D.Ark.1958); St. Louis I. M. & S. Ry. Co. v. Yates, 111 Ark. 486, 165 S.W. 282, 285 (1914); Watland v. Walton, 410 F.2d 1, 3 (8 Cir. 1969).

Affirmed as to defendants Washington General Hospital and Empire Fire & Marine Insurance Co.; reversed as to defendant James D. Mashburn and remanded for a new trial.