Nora V. VASSOS, Administratrix and Personal Representative of the Estate of Gus Vassos, deceased, Appellant (Plaintiff),

v.

Louis J. ROUSSALIS, M.D., Appellee (Defendant).

No. 5751.

Supreme Court of Wyoming.

Feb. 17, 1983.

Terry W. Mackey (argued), Cheyenne, and John Hursh, Riverton, for appellant.

J.E. Vlastos, Casper, for appellee.

Before ROONEY *, C.J., and RAPER, THOMAS, ROSE **, and BROWN, JJ.

RAPER, Justice.

This matter began when Nora Vassos (appellant), as personal representative, filed an action in the district court for the wrongful death of her husband, Gus Vassos, alleging that his death was caused by medical malpractice on the part of Dr. Louis J. Roussalis (appellee) and Dr. John Corbett. This is the second time this matter has been before this court on appeal.[1] In the first appeal, a summary judgment that had been entered against appellant was reversed and the case remanded to the district court for further proceedings. *Vassos v. Roussalis,*

Wyo., 625 P.2d 768 (1981). On remand, a jury trial was begun in the district court. This appeal is from the district court's entry of a directed verdict for appellee at the close of appellant's case in chief. The single issue appellant raises for our consideration is whether the district court erred in granting appellee's motion for a directed verdict.

We will reverse and remand.

At this point we set out certain events that led to the filing of this malpractice action. We reserve discussion of the facts that deal with the substance of the claim until later, i.e., negligence, causation, etc. On June 7, 1976, Gus Vassos suffered stomach pains causing him to leave work early. His stomach discomfort worsened to the point that, later that same day, he went to the emergency room at Natrona County Memorial Hospital. At the emergency room, Mr. Vassos was examined and admitted to the hospital by Dr. Ellbogen who was on call for Mr. Vassos' regular physician, appellee. At that time Mr. Vassos' condition was diagnosed as "acute gastritis," and routine laboratory tests were ordered.

On June 8, appellee began treating Mr. Vassos for pain in the upper right quadrant of his abdomen. Appellee initially diagnosed Mr. Vassos' condition as "probable acute G.B. [gallbladder] disease," and at that time ordered various tests including x-rays. On June 9, more x-ray tests were conducted and appellee continued to diagnose Mr. Vassos' condition as probable acute gallbladder disease and treated him accordingly. On that day appellee initially contacted Dr. Corbett and requested that Dr. Corbett, a general surgeon, consult on the case. On June 10, Dr. Corbett examined Mr. Vassos and, after further x-ray tests indicated a subphrenic and subhepatic abscess, recommended immediate surgery. Dr. Corbett's preoperative diagnosis was that Mr. Vassos was suffering from "[p]robable necrotizing cholecystitis with rupture.

---

* Became Chief Justice on January 1, 1983.

** Chief Justice at time of oral argument.

1. After this court remanded this matter to the district court and before trial was begun, the district court entered an order dismissing this action against Dr. John Corbett with prejudice.

Possible ruptured appendix. Possible ruptured ulcer." Exploratory surgery was performed in the evening of June 10 by Dr. Corbett. Dr. Corbett discovered Mr. Vassos had a ruptured appendix with diffuse peritonitis.

From June 10, 1976, until his death on August 16, 1976, Mr. Vassos was hospitalized in Natrona County Memorial Hospital. He was treated by his surgeon, Dr. Corbett, and his own family physician, appellee. After his surgery, and until his death, Mr. Vassos continued to suffer from the aftereffects of his ruptured appendix, i.e., infection and its complications. Mr. Vassos suffered a cardiac arrest on July 22, 1976, and from then, until he was declared dead on the 16th of August, he was maintained on a respirator. Dr. Corbett indicated at trial that for all intents and purposes Mr. Vassos was dead from the time of his cardiac arrest. On Mr. Vassos' death certificate, Dr. Corbett indicated the cause of death to be myocardial failure due to and as a consequence of generalized sepsis and peritonitis which was caused by a ruptured appendix.

The directed verdict was entered by the district court in response to appellee's motion made pursuant to Rule 50(a), W.R.C.P.[2] Since questions of law are for courts to determine and questions of fact are for juries, the purpose of Rule 50, W.R.C.P., is to provide a device of judicial control so that courts may enforce rules of law. *Carey v. Jackson,* Wyo., 603 P.2d 868 (1979). In commenting on the purpose of Rule 50, F.R.C.P., which is identical to our Rule 50, W.R.C.P., it has been said:

"Rule 50(a) provides for a motion for a directed verdict at the close of the plaintiff's evidence or at the close of the evidence and before the case is submitted to the jury. It enables the court to determine whether there is any question of

fact to be submitted to the jury and whether any verdict other than the one directed would be erroneous as a matter of law. It is conceived as a device to save the time and trouble involved in a lengthy jury determination. Rule 50(b) allows the court to reserve the decision of this question of law until after the case has been submitted to the jury and they have reached their verdict or disagreed. If the court decides that a verdict should have been directed it may set aside the verdict of the jury and enter a judgment notwithstanding the verdict. Thus it gives the trial court a last chance to order the judgment that the law requires. * * *" (Footnotes omitted.) 9 Wright & Miller, Federal Practice and Procedure: Civil § 2521.

In reviewing the district court's decision to grant a directed verdict for appellee (defendant) at the close of appellant's (plaintiff's) case in chief, we will consider all of the evidence favorable to the party against whom the motion is directed (appellant) together with all reasonable and legitimate inferences which may be drawn therefrom. *Carey v. Jackson,* supra; *Town of Jackson v. Shaw,* Wyo., 569 P.2d 1246 (1977). When determining the question of sufficiency of the evidence on a motion for a directed verdict, we must, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, determine whether there can be but one conclusion as to the verdict that reasonable jurors could have reached. *Carey v. Jackson,* supra; *Town of Jackson v. Shaw,* supra; *Barnes v. Fernandez,* Wyo., 526 P.2d 983 (1974). Credibility of the witnesses and the weight given their testimony are for the jury to determine. *Kahler v. Martin,* Wyo., 570 P.2d 720 (1977); *Cimoli v. Greyhound Corp.,* Wyo., 372 P.2d 170 (1962).

---

2. Rule 50(a), W.R.C.P., provides:
 "A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury."

Whether or not appellant's evidence, viewed in the light most favorable to her, is sufficient to create an issue for the jury to consider is solely a question of law to be answered by the trial court. *Town of Jackson v. Shaw,* supra.

 Although some appellate courts have taken the view that they will not superimpose their judgment on that of the trial court in reviewing a directed verdict, we do not hold such a view. In *Carey v. Jackson,* supra at 877, this court set out the view that on review of a directed verdict no deference will be given to the view of the trial court.

> " 'In determining whether a verdict should have been directed, the appellate court applies the same standard as does the trial court in passing on the motion originally. * * * Whether a verdict should be directed is a question of law and on those questions litigants are entitled to full review by the appellate court without special deference to the views of the trial court.' 9 Wright and Miller, Federal Practice and Procedure, Civil, § 2536, p. 595, and § 2524, pp. 541–542."

This court also takes the view that motions for directed verdicts should be cautiously and sparingly granted. *Carey v. Jackson,* supra. We note that in questionable cases Rule 50, W.R.C.P., provides options other than simply granting a motion for directed verdict at the close of plaintiff's case. Among other things, rather than direct a verdict as was done here, the trial court can reserve judgment until the close of all evidence or entertain, after a verdict has been rendered, a motion for a judgment notwithstanding the verdict. It has been stated that:

> "Even at the close of all the evidence it may be desirable to refrain from directing a verdict though it would be possible to do so. If a verdict is directed and the appellate court holds that the evidence was in fact sufficient to go to the jury, an entire new trial must be had. If, on the other hand, the trial court submits the case to the jury, though it thinks the evidence insufficient, final determination

of the case is greatly expedited. If the jury agrees with the court's appraisal of the evidence, and returns a verdict for the party who moved for a directed verdict, the case is at an end. If the jury brings in a different verdict, the trial court can grant judgment notwithstanding the verdict. Then if the appellate court holds that the trial court was in error in its appraisal of the evidence, it can reverse and order judgment on the verdict of the jury, without any need for a new trial. For this reason the appellate courts have repeatedly said that it is usually desirable to take a verdict, and then pass on the sufficiency of the evidence on a post-verdict motion." (Footnote omitted.) 9 Wright & Miller, Federal Practice and Procedure: Civil § 2533.

 The matter before us is a medical malpractice action, and, as we noted in our first review of this matter, it is, as such, simply a particular form of a negligence action. *Vassos v. Roussalis,* supra, 625 P.2d at 772. As in any other negligence action, the plaintiff in a malpractice action must prove that the defendant owed a duty to the plaintiff and that the failure to perform that duty proximately caused damage to plaintiff. Id. Put another way, the law, in a malpractice action, only imposes liability for a breach of a legal duty by a doctor proximately causing injury to the plaintiff. *Harris v. Grizzle,* Wyo., 625 P.2d 747 (1981). The determination of the standard of care or duty owed by the defendant is a matter of law and not the province of the jury. *Vassos v. Roussalis,* supra.

 Appellant, then, to survive a motion for a directed verdict must present sufficient evidence that appellee failed to meet the standard of care he owed the deceased and thereby caused his harm. As we noted in our first disposition of this case, a doctor's duty to his patient is established by the existence of a physician-patient relationship. *Vassos v. Roussalis,* supra at 772. The extent of that duty or the standard of care owed by a physician is that:

> " * * * [A] physician or surgeon must exercise the skill, diligence and knowl-

edge, and must apply the means and methods, which would reasonably be exercised and applied under similar circumstances by members of his profession in good standing and in the same line of practice. [Citations.]

"The skill, diligence, knowledge, means and methods are not those 'ordinarily' or 'generally' or 'customarily' exercised or applied, but are those that are 'reasonably' exercised or applied. Negligence cannot be excused on the grounds that others practice the same kind of negligence. Medicine is not an exact science and the proper practice cannot be gauged by a fixed rule. [Citations.]" *Vassos v. Roussalis,* supra, 625 P.2d at 772.

This court thereby indicated that a strict adherence to the so-called "locality rule" was no longer necessary in the determination of the standard of care owed by physicians in medical malpractice cases; we continue to so hold. See also, *DeHerrera v. Memorial Hosp. of Carbon Cty.,* Wyo., 590 P.2d 1342, 1346 (1979) (Rooney, J., concurring opinion). We make that statement in response to some confusion on that point among the parties.

■ To prove negligence in a medical malpractice case, except in cases where a physician's alleged negligence consists of conduct so obviously wanting in reasonable medical skill and prudence it may be so adjudged by laymen, *Stundon v. Stadnik,* Wyo., 469 P.2d 16 (1970), the plaintiff has the burden of producing expert testimony to support a prima facie case of negligence. *Harris v. Grizzle,* supra; *Vassos v. Roussalis,* supra; see also, Annot., Necessity of expert evidence to support an action for malpractice against a physician or surgeon, 81 A.L.R.2d 597 (1962). In other words, appellant had to present expert testimony on the standard of care appellee owed; whether or not he met that standard; and, if not, whether that failure caused the death of her husband, Gus Vassos. If appellant failed to present such expert testimony, the verdict should have been directed for appellee.

With the aforementioned law in mind, we turn to the problem at hand. The district court, in announcing its reason for entering a directed verdict for appellee, stated that appellant had failed to submit "the kind of evidence on proximate cause, which will meet the required legal standard" to overcome a motion for directed verdict. We, therefore, address that point.

■ At trial, appellant produced testimony from four medical experts—Dr. John Corbett, surgeon; Dr. William F. Flick, surgeon; Dr. William R. Wahl, family practitioner; and appellee, family practitioner and surgeon. With these experts appellant provided detailed testimony concerning the care and treatment of Gus Vassos from the time of his admission to the hospital until his subsequent death. The testimony of the various doctors analyzed the various medical chart entries made in the case, the x-ray films taken during the course of treatment, the surgical procedures followed, the post operative care, etc. This exhaustive medical testimony was received over a three-day period. Drs. Flick and Wahl, in addition, testified to the standard of care owed by the various physicians involved in Gus Vassos' case and their opinions whether that standard of care was met. Both doctors testified as to whether, in their opinion, any failures to meet the standard of care proximately caused the death of Gus Vassos. Based on the expert testimony in the record, we find from our review of the transcript that appellant produced sufficient evidence that appellee's negligence proximately caused Gus Vassos' death to overcome a motion for a directed verdict.

Dr. Corbett, the treating surgeon, testified extensively on the course and conduct of the treatment of Gus Vassos from June 10, 1976, the date he entered the case. He clearly indicated that appellee had actively participated in the treatment of Gus Vassos with his, Dr. Corbett's, whole-hearted approval. It was a team effort. Although Dr. Corbett testified that he, as the treating surgeon, was primarily responsible for Gus Vassos' care, he acknowledged that appellee actively participated as a team member in

Gus Vassos' treatment and as such wrote orders for tests, prescribed medication, made daily visits, etc.

Appellee, when called as an adverse witness, testified on direct examination that he had actively treated Gus Vassos in the hospital from June 8, 1976, until Gus Vassos died on August 16, 1976. He also testified that a bill for his services during that time period in the sum of $1,467.50 was sent to appellant.[3] The other two doctors that testified, Drs. Flick and Wahl, were also of the opinion from a review of Gus Vassos' chart that appellee, by writing orders, etc., had actively treated Gus Vassos along with Dr. Corbett.

Since we have already stated that a physician's duty is established as a matter of law by the existence of a physician-patient relationship, it is clear that appellee's active participation created a duty to his patient, Gus Vassos. It would be ridiculous to hold otherwise. Appellee, in continuing to actively treat Gus Vassos, undertook the duty and responsibility to do so in a manner that conformed with the recognized standards of medical practice. A departure from those standards would be negligence. We must then determine if there is expert testimony of negligence and causation.

Dr. Flick, providing expert testimony as a surgeon, testified to the standard of care which should be provided to patients suffering as Gus Vassos did from diffuse peritonitis resulting from a ruptured appendix. Dr. Flick testified that in his opinion Dr. Corbett failed to meet that required standard in treating Gus Vassos' infection and subsequent abdominal abscess, and that failure to so treat proximately caused Gus Vassos' death. Dr. Flick testified that all medical students, which would include appellee, receive training in the proper management of infection like the one suffered by Gus Vassos. The negligence attributed to the treatment testified to by Dr. Flick centered around the decision to discontinue antibiotic treatment coupled with a failure to surgically drain an existing abscess for the period of July 9, 1976, through July 22, 1976, when there was ample diagnostic evidence that such an abscess had been formed which could be drained. Dr. Flick testified that failure to treat an intra-abdominal infection with either antibiotics or a combination of drainage and antibiotics would result in the patient's death and in fact this patient did die from such a failure. What can be logically inferred from Dr. Flick's testimony is the fact that, since appellee was actively participating in the treatment of Gus Vassos, and since every doctor has been taught the consequence of failure to treat an intra-abdominal infection, any negligence in treating such an infection can be in part attributed to appellee; and that negligence proximately caused Gus Vassos' death.

We also find it to be a telling point that appellee, in his testimony, admitted that he held himself out to the public as both a family practitioner and a surgeon. Appellee also testified that he had performed both appendectomies and gall bladder surgery. Dr. Flick had made it quite clear in his testimony that surgeons, above all others, should be held to know the standard of care required in treating intra-abdominal infections and the results of failure to so treat.

Appellant called Dr. William R. Wahl, family practitioner, to testify to the standard of care required of family practitioners; whether that standard had been met by appellee; and, if it had not, whether that failure proximately caused Gus Vassos' death. Dr. Wahl confirmed that the standard of care for physicians engaged in a family practice specialty in treating an intra-abdominal abscess is "incision and drain," and antibiotics. Dr. Wahl testified that the failure to so treat Gus Vassos from July 9 to July 22 on the part of the treating physician probably caused his death. Dr.

---

**3.** Although bills for appellee's services in the amount of $1,467.50 were sent to appellant on numerous occasions by appellee up until February, 1982, appellee contends that the bills should not have been sent and that he had asked the several billing services he had employed since 1976 to put the bill to appellant on hold on advice of his attorney, Mr. Vlastos, apparently as a result of this suit.

Wahl indicated that, in his opinion, because appellee had taken such an active role in treating Gus Vassos, he was responsible as a treating physician. Therefore, a jury could quite logically infer that since appellee knew or should have known the proper method of treating Gus Vassos' condition, and that the failure to properly treat that condition proximately caused Gus Vassos' death, appellee's negligence proximately caused Gus Vassos' death.

Dr. Wahl expressed that in his opinion appellee was negligent in not expressing his concern about the continued treatment being given by Dr. Corbett. Although appellee would have us believe that the negligence raised by Dr. Wahl in this regard was simply the negligent omission of a notation in the record, that is simply not the case. To fully understand this point, Dr. Wahl's complete testimony must be read rather than the selected portions appellee points out. On such a reading it is obvious that Dr. Wahl could only deduce what did or did not occur in the treatment of Gus Vassos from the various medical records; and from those records no notation was made which would indicate that appellee confronted Dr. Corbett or anyone else with a concern that Gus Vassos' treatment was not being conducted properly. Normally if such confrontation had occurred, it would have been documented. Failure to express such concern was evidence of negligence in view of the fact that, in Dr. Wahl's opinion, Gus Vassos' treatment had dropped below acceptable standards. The lack of documentation is, from Dr. Wahl's testimony, evidence from which the jury could infer that no confrontation occurred and was evidence of negligence for consideration by the jury in its fact-finding role.

Appellee should be well aware that Dr. Wahl did not allege that failure to write a note in a record caused Gus Vassos' death; that would be unreal. Since appellee explored Dr. Wahl's testimony on cross-examination at length, it should be obvious that Dr. Wahl was concerned, in this instance, with appellee's failure to confront Dr. Corbett with Gus Vassos' continued poor condition and the failure to properly treat an abscess which, in Dr. Wahl's opinion, existed. Dr. Wahl made his position quite clear when, in response to questioning on cross-examination, he indicated that appellee, at the very least, should have obtained the services of another surgeon when it appeared Dr. Corbett's course of treatment was not working.

When asked on direct examination whether appellee's failure to confront Dr. Corbett proximately caused the death of Gus Vassos, Dr. Wahl answered "possibly." Appellee calls to our attention the language in *Harris v. Grizzle,* supra, 625 P.2d at 752, which he argues makes Dr. Wahl's statement "possibly" insufficient to create a causal connection between the alleged negligence and the death. We quote the full text of that statement.

> " * * * If the origin of the injury is obscure and not readily apparent to a layman, or if there are several equally probable causes of the condition, testimony of a qualified physician is essential to establish a reasonable probability that the physician's negligence caused the injury. * * * " *Harris v. Grizzle,* supra, at 752.

That statement tracks the general view of the law, and we continue to adhere to the proposition it sets out. See also, Annot., Proximate cause in malpractice cases, 13 A.L.R.2d 11 (1950). However, we do not hold that the sufficiency or competency of Dr. Wahl's testimony depends on whether he used the term "probably" or the term "possibly." We agree with the opinion of the court in *Norland v. Washington General Hospital,* 461 F.2d 694 (8th Cir.1972), when addressing the same issue:

> "The use of the terms 'probable' and 'possible' as a basis for test of qualification or lack of qualification in respect to a medical opinion has frequently converted this aspect of a trial into a mere semantic ritual or hassle. The courts have come to recognize that the competency of a doctor's testimony cannot soundly be permitted to turn on a mechanical rule of law as to which of the two terms he has employed. Regardless of which term he

may have used, if his testimony is such in nature and basis of hypothesis as to judicially impress that the opinion expressed represents his professional judgment as to the most likely one among the possible causes of the physical condition involved, the court is entitled to admit the opinion and leave its weight to the jury. * * * " Id. at 697.

From Dr. Wahl's testimony, the jury could logically infer that in Dr. Wahl's opinion, since appellee was in constant contact with Gus Vassos' case as a treating physician, he should have recognized that the treatment of Gus Vassos' infection was not going well and had dropped below recognized standards of medical practice. Appellee, in Dr. Wahl's opinion, then should have confronted Dr. Corbett with his fears and, if no change in treatment resulted, appellee owed Gus Vassos the duty to call in another surgeon. Failure to attempt to change the course of Gus Vassos' treatment led to his death. That failure, in Dr. Wahl's opinion, occurred because appellee either did not recognize the departure in the standard of care owed Gus Vassos or, if he did, he failed to cause it to change by calling the matter to Dr. Corbett's attention or by calling another surgeon into the case. In any event, Dr. Wahl's testimony, taken as a whole, could have allowed a jury to reach the conclusion that appellee was negligent as a treating physician and that negligence was a proximate cause of Gus Vassos' death.

From the various testimony presented by appellant, it is clear to us that a case of medical malpractice was made sufficient to withstand the attack of a motion for directed verdict. The jury had before it that appellee, as one of Gus Vassos' treating physicians, owed him a duty to see to it that he received medical care that conformed with recognized standards of medical practice. There was ample evidence received from qualified medical experts that the treatment provided Gus Vassos departed from those recognized standards, and because of that departure, Gus Vassos died. Our job in deciding the propriety of the district court's decision to direct a verdict for appellee was to view the evidence in the light most favorable to appellee; that we have done. Our job is not the same as that which a jury will ultimately have. Therefore, our decision goes to a matter of law, where theirs will ultimately go to the truth of the claim after weighing all of the evidence. We, therefore, hold that, under our standard of review, appellant presented sufficient evidence on both negligence and proximate cause that the jury could find appellee liable for medical malpractice. As a result of that decision, we are compelled to hold that the district court erred in directing a verdict for appellee.

Reversed and remanded for trial.

ROONEY, Chief Justice, dissenting.

I do not contest the general law set forth in the majority opinion, but I believe that the majority opinion does not adequately distinguish between the standard of care and the existence of the duty in this case as a necessary element of negligence. The resulting situation is one which will hamstring the administration of proper medical treatment to patients by physicians.

The standard of care is not the problem in this case. It is properly set forth in the majority opinion in its quote from the first case of *Vassos v. Roussalis,* Wyo., 625 P.2d 768, 772 (1981). Here the problem is: Who owes the duty to apply this standard of care in this instance? The essential nature of the existence of a duty is also recognized by the majority opinion:

"* * * As in any other negligence action, the plaintiff in a malpractice action *must prove that the defendant owed a duty to the plaintiff* and that the failure to perform that duty proximately caused damage to plaintiff. * * * " (Emphasis added.)

Also see first case of *Vassos v. Roussalis,* supra; *ABC Builders, Inc. v. Phillips,* Wyo., 632 P.2d 925 (1981).

The standard of care is a necessary complement of duty. It defines that of which the duty consists. But standing alone, without the obligation arising from the duty itself, it is without force in determining the existence of negligence.

" * * * In other words, 'duty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty. The distinction is one of convenience only, and it must be remembered that the two are correlative, and one cannot exist without the other." Prosser on Torts (4th Ed. 1971), § 53, p. 324; and see § 37, p. 206.

The existence of a duty, and the standard of conduct is entirely a question of law for the court. First case of *Vassos v. Roussalis,* supra; *Maxted v. Pacific Car and Foundary Company,* Wyo., 527 P.2d 832 (1974). In this instance, it was entirely proper for the court to grant appellee's motion for a directed verdict if he did not owe a duty to the deceased to make the decision relative to the treatment which caused the death. The trial court decided that appellee did not have such duty, and the evidence supports that decision.

The entire medical testimony, taken as a whole, reflects the duty and responsibility for the treatment of the deceased was that of Dr. Corbett. The trial court was acting reasonably and predictably when it determined the duty owed to the deceased which was not performed and which proximately caused his death was that of Dr. Corbett and not that of appellee.

The majority opinion refers to testimony of Drs. Flick and Wahl from which it can be "*inferred*" that appellee was negligent and that "no confrontation occurred" between appellee and Dr. Corbett. There was no inference in Dr. Corbett's testimony. He testified that he performed surgery on the deceased and controlled the post-operative treatment of him until the time of death. He testified in part:

"Q. Now, Doctor, once the surgery is completed into the postoperative time, who is responsible for the management of the care and treatment of the patient?

"A. Surgeon.

"Q. Will the surgeon continue to assess and evaluate post operatively?

"A. Yes, sir.

"Q. On his own?

"A. Yes, sir.

"Q. Will the surgeon rely upon some other entries made by say the referring physician?

"A. Yes, but rarely without checking them or discussing them. For instance the referring physician said something in the progress record that I disagreed with I would go and find out why his feeling was different than mine and we would resolve it.

"Q. So, I take it again because the decision of the surgeon, the surgeon would be taking care to make his own assessment and evaluation?

"A. Yes, sir.

"Q. Throughout the post operative care.

"A. Yes, sir.

 \* \* \* \* \* \*

"Q. And throughout this matter any decision made concerning the care and treatment of this patient was yours to make?

"A. Yes, sir."

Appellee's testimony was without inference. It was in part:

"Q. Did you treat him for anything else while he was in the hospital during that period of time?

"A. Followed him after he went to surgery, followed him with advisement, followed him with Dr. Corbett and helped Dr. Corbett throughout his care.

"Q. Did you provide treatment to Gus Vassos?

"A. I provided care for Gus.

 \* \* \* \* \* \*

"Q. Were you satisfied of that during the period of time that you were caring for Gus Vassos in the hospital?

"A. I was satisfied with Dr. Corbett's management of it, correct.

 \* \* \* \* \* \*

"Q. Okay. What do you understand the treatment to be to an intra abdominal infection such as you understood to exist in Gus?

"A. Treatments to be prescribed by the surgeon, I don't handle them.

"Q. So, you don't know what they are?

"A. I do, but I don't handle it, I would ask him to prescribe what the range of motion, or, treatment he would want, and we would follow that treatment.

"Q. You would ask the surgeon to do that?

"A. Right.

\* \* \* \* \* \*

"Q. Okay. So these are decisions for people who hold themselves out as surgeons to make?

"A. That is correct.

"Q. And you don't make those decisions?

"A. That is correct.

\* \* \* \* \* \*

"Q. I take it the care was under the surgeon?

"A. Certainly.

"Q. You assisted him in every way?

"A. Yes."

The majority opinion properly reflects that Dr. Flick's testimony was to the effect that:

"* * * *Dr. Corbett failed* to meet that required standard in treating Gus Vassos' infection and subsequent abdominal abscess, and that failure to so treat proximately caused Gus Vassos' death. * * * *"* (Emphasis added.)

There was no inference in this testimony. He testified in more than one instance that the post-operative care of patients is generally provided by the general surgeon.

Dr. Wahl also testified that the post-operative care of a patient is the responsibility of the surgeon:

"Q. Now, my question is you will agree with me, will you not, that it is within the realm of the surgeon to map out and plan the post operative care and treatment, isn't that right?

"A. Yes."

He was critical of appellee for ordering continuation of certain prescriptions during the post-operative period, for not disagreeing with Dr. Corbett, and for not recording a disagreement with the surgeon's treatment. The majority opinion seems to attach liability from lack of "confrontation."

The entire testimony of Dr. Wahl is to the effect that proper medical practice requires the placing of the duty to prescribe treatment in one person—the surgeon in this instance.

Dr. Wahl's complaint against appellee concerning his failure to argue with Dr. Corbett about Dr. Corbett's treatment infers a duty on the part of a physician to adversely criticize the action of another physician or be held liable for any improper action taken by the other physician. It is imperative that complete consultive dialogues be encouraged between physicians. The majority opinion hamstrings such dialogue. A physician will either completely avoid any involvement in the case of another physician or he will take a stand contrary to that of the other inquiring physician if he wants to avoid possible future litigation. Medicine is not an exact science. In most instances, there must be a single ultimate decision maker—other than the patient himself.

There cannot be two captains of the ship. There cannot be two steering wheels directing the course of an automobile. There cannot be two physicians responsible for the ultimate control of the treatment of a patient. A captain of a ship may ask for directional, depth, and other readings from his crew. The driver of an automobile may verify his road signs and map directions with his passengers. And a physician may consult with and consider the nature of treatment with associates. But the ultimate duty to bring the ship safely home is that of the captain. The ultimate duty to keep the automobile on the road is that of the driver. And the ultimate duty to pre-

scribe the treatment for the patient is the physician in charge of the case.[1]

The majority opinion speaks repetitiously of appellee as the "treating physician" and of his participation in a "team effort." All eleven men on a football team are participating in a "team effort" and they are all "treating athletes" in performing toward victory, but the only one responsible for the loss is the wide receiver who drops the easily caught pass in the end zone which would have resulted in a winning touchdown. It was his duty to catch the ball, and his teammates should not be held responsible for his failure to do so. For liability to attach there must be some causal connection between a responsibility for action or non-action and the bad result, but before such can be inquired into, there must first be the responsibility itself. Appellant had the burden of establishing such causation on the part of appellee. Not only was the burden not met, but there was no evidence whatsoever that appellee's actions or inactions caused the death of the deceased. *Stundon v. Stadnik,* Wyo., 469 P.2d 16 (1970).

There is not a scintilla of evidence that Dr. Corbett would have followed suggestions or advice received from appellee, from any other physician, from the "treating" nurses or from anyone else. The evidence is to the contrary. He was running the show. He was satisfied with his prescribed treatment. If the death resulted therefrom, it was proximately caused only by his decision. The duty to make the decision was his alone.

Appellant has settled with Dr. Corbett. Dr. Corbett may not have acknowledged liability on his part through the settlement, but it reflects such liability to have been his if, in fact, anyone was liable. It reflects that he was captain of the ship. The trial court was correct in directing a verdict for appellee on the basis that he did not owe a duty to appellant with reference to the

incident which proximately caused the death.

I would affirm.

---

1. Of course, liability for violation of other duties may rest on others, e.g. failure by those responsible for properly carrying out the directions of the physician in charge may result in liability.