Angelina ROYBAL, Appellant
(Plaintiff),

v.

Gregory F. BELL, D.D.S.,
Appellee (Defendant).

No. 88–292.

Supreme Court of Wyoming.

July 27, 1989.

Rodger McDaniel, Cheyenne, and Jack Kintzele, Denver, Colo., for appellant.

Larry B. Kehl and George J. Argeris of Guy, Williams, White & Argeris, Cheyenne, for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

MACY, Justice.

This is a dental malpractice case specifically involving the question of informed consent. The district court granted summary judgment to appellee Gregory F. Bell, D.D.S., and appellant Angelina Roybal pursued this appeal.

Although variously stated by the parties, the substance of the issues presented is simply whether or not factual questions exist on the elements of appellant's claim which would preclude the entry of summary judgment. We conclude that material factual disputes are indicated in the record, and therefore we reverse.

In May 1983, appellant began an extensive course of dental treatment which eventually involved the three dentists originally named as defendants in this case: appellee Bell, Dr. Richard Giovale, and Dr. Rex Dolan. Appellant first saw Dr. Giovale in May 1983 regarding a loose bridge. In June 1983 Dr. Giovale performed a root canal for appellant on a tooth designated as

tooth # 20, which was located in the lower left jaw. Thereafter, appellant reported experiencing pain associated with tooth # 20. According to appellant, attempts by Dr. Giovale over the next several months to alleviate the continuing problems with tooth # 20 were unsuccessful.

Dr. Giovale concurrently was performing various dental work on appellant's upper right teeth, including bridge work and at least one further root canal. One of the teeth in the upper right developed an abscess on the root requiring an oral surgical procedure known as an apicoectomy.[1] Appellant was referred to appellee for this procedure. This apicoectomy was completed successfully by appellee in July 1984.

Appellant continued to experience problems with tooth # 20, and in early 1985 Dr. Giovale referred her to appellee for an apicoectomy on that tooth. The apicoectomy on tooth # 20 was performed in April 1985. After the apicoectomy on tooth # 20, appellant experienced continued pain and numbness (paresthesia) in the general area of that tooth. Consequently, after further consultation and a referral for a second opinion, Dr. Giovale referred appellant to Dr. Dolan for extraction of tooth # 20, which was performed in January 1986. According to appellant, the extraction of the tooth did not remedy the pain and paresthesia. Appellant asserts, with support in the record, that she sustained permanent nerve damage as a result of the dental procedures associated with tooth # 20.[2]

On August 11, 1987, appellant initiated an action against appellee, Dr. Giovale, and Dr. Dolan by filing a complaint in the district court. Appellant asserted causes of action premised on theories of negligent treatment, negligent failure to obtain an informed consent, res ipsa loquitur, and breach of warranty.[3] Each defendant answered, generally denying the allegations. Thereafter, the defendants filed motions for summary judgment supported by affidavits, exhibits, memoranda, and the deposition of appellant. On July 15, 1988, the district court entered an order dismissing Dr. Dolan from the action pursuant to a stipulation between appellant and that defendant. Appellant then submitted a memorandum in opposition to summary judgment accompanied by her deposition, an affidavit containing the expert opinion of Dr. Boyd Tomasetti, and various documentary materials primarily consisting of appellant's dental records. Prior to the summary judgment hearing, appellant and Dr. Giovale reached an out-of-court settlement.

The summary judgment hearing was held on August 1, 1988, with appellee as the only remaining defendant. A transcript of the motion hearing has not been provided in the record on appeal. Apparently, however, as reflected in the briefs of the parties, counsel for appellant informed the district court at the hearing that appellant was dropping all claims against appellee except the claim relating to the alleged failure to obtain an informed consent in connection with the apicoectomy on tooth # 20. After requesting and receiving further briefing on the question of informed consent, the district court entered its decision letter and order granting summary judgment to appellee. This appeal followed.

We begin by reiterating our standard for reviewing a summary judgment. Summary judgment is proper only when there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law. *Doud v. First Interstate Bank of Gillette*, 769 P.2d 927 (Wyo.1989); *Teton Plumbing and Heating, Inc. v. Board of Trustees, Laramie County*

---

1. An apicoectomy is defined in 1 J. Schmidt, *Attorneys' Dictionary of Medicine* at A–285 (1986) as: "Excision of the apex of the root of a tooth" or "excision of the root of a tooth."

2. According to appellant's deposition testimony, she has been advised by dental and neurological specialists in Denver, Colorado, that the only treatment alternatives remaining for her are either to have the affected nerve severed, which would result in a total loss of sensation on much of the left side of her face, or to learn to live with the pain and paresthesia.

3. Certain of the allegations in the complaint refer to dental procedures performed by the defendants other than those associated with tooth # 20 and which are not involved in the issues presented in this appeal.

*School District Number One,* 763 P.2d 843 (Wyo.1988). We review a grant of summary judgment in the same light as the district court, using the same information and following the same standards. *Doud,* 769 P.2d 927; *Johnston v. Conoco, Inc.,* 758 P.2d 566 (Wyo.1988). We examine the record from the vantage point most favorable to the party opposing the motion, giving that party the benefit of all favorable inferences which may be drawn from the record. *Doud,* 769 P.2d 927; *Albrecht v. Zwaanshoek Holding En Financiering, B.V.,* 762 P.2d 1174 (Wyo.1988). We have often stated that summary judgment is not favored in negligence actions. *O'Donnell v. City of Casper,* 696 P.2d 1278 (Wyo. 1985); *DeHerrera v. Memorial Hospital of Carbon County,* 590 P.2d 1342 (Wyo.1979). In *DeHerrera,* we said:

> "[S]ummary judgment procedures should be applied with special caution in negligence actions. This is particularly true in malpractice suits where, as here, the attending facts are peculiarly within the knowledge of the movants and the showing of negligence is generally dependent upon expert testimony as to the standard of care required and observed."

*Id.* at 1345 (quoting *Holl v. Talcott,* 191 So.2d 40, 46 (Fla.1966) (citations omitted)).

 This Court has not had occasion to address the law of informed consent since the case of *Stundon v. Stadnik,* 469 P.2d 16 (Wyo.1970), which in turn relied heavily upon the prior case of *Govin v. Hunter,* 374 P.2d 421 (Wyo.1962). Informed consent law has evolved as a variant of medical malpractice. *Bloskas v. Murray,* 646 P.2d 907, 914, 42 A.L.R.4th 527 (Colo.1982). *See generally* 1 S. Pegalis and H. Wachsman, *American Law of Medical Malpractice* §§ 2:1 and 2:15 (1980). Originally conceived as an offshoot of the law of battery, informed consent is now generally treated under a theory of negligence. 1 S. Pegalis and H. Wachsman, *supra* at § 2:15; 2 D. Louisell and H. Williams, *Medical Malpractice* ¶ 22.04

(1988).[4] The essential elements in a malpractice action are equally applicable in an informed consent case. The plaintiff must establish (1) that the practitioner owed a duty to the plaintiff; (2) that the practitioner failed to perform the duty; (3) that the breach of duty proximately caused (4) injury to the plaintiff. *Fiedler v. Steger,* 713 P.2d 773, 775 (Wyo.1986); *Vassos v. Roussalis,* 625 P.2d 768 (Wyo.1981) (*Vassos I*), *appeal after remand* 658 P.2d 1284 (Wyo. 1983) (*Vassos II*); *Harris v. Grizzle,* 625 P.2d 747 (Wyo.1981). Further, we have stated that the mere fact of injury or a bad result, standing alone, is not proof of negligence and will not overcome a motion for summary judgment. *Siebert v. Fowler,* 637 P.2d 255, 257 (Wyo.1981); *Harris,* 625 P.2d 747.

 The determination of the standard of care or duty imposed upon the defendant is a matter of law and is not within the province of the jury. *Vassos II,* 658 P.2d at 1287. The existence of the physician-patient relationship establishes a duty, and the standard is fixed as that which is required of a reasonable person in the light of all the circumstances. *Kobos by and through Kobos v. Everts,* 768 P.2d 534, 538 (Wyo.1989); *Vassos I,* 625 P.2d 768. In *Govin,* 374 P.2d at 423, we elaborated upon the duty of disclosure required for informed consent:

> We realize that under certain circumstances a physician has a duty to reveal any serious risks which are involved in a contemplated operation. But, how a physician chooses to discharge his obligations to a patient involves primarily a question of medical judgment. As long as his disclosure is sufficient to assure an informed consent, and if it appears that he proceeded as competent medical men would have done in a similar situation, the physician's actions should not be called into question.

We further stated:

> Whether or not a surgeon is under a duty to warn a patient of the possibility

---

**4.** The battery theory remains applicable where a treatment or procedure was completely unauthorized, whereas negligence principles apply to the more often encountered situation where the treatment or procedure was authorized but the consent was uninformed. 2 D. Louisell and H. Williams, *supra.*

of a specific adverse result of a proposed treatment depends upon the circumstances of the particular case and upon the general practice followed by the medical profession in the locality; and the custom of the medical profession to warn must be established by expert medical testimony.

*Id.* at 424, *quoted in Stundon,* 469 P.2d at 21.

The above standards regarding informed consent must be read in conjunction with the more recent pronouncements of this Court regarding medical malpractice in general. We have moved away from strict adherence to the "locality" rule recited in *Govin. Kobos by and through Kobos,* 768 P.2d 534; *DeHerrera,* 590 P.2d 1342. Thus, we said in *Vassos I,* 625 P.2d at 772:

[A] physician or surgeon must exercise the skill, diligence and knowledge, and must apply the means and methods, which would reasonably be exercised and applied under similar circumstances by members of his profession in good standing and in the same line of practice.

The skill, diligence, knowledge, means and methods are not those "ordinarily" or "generally" or "customarily" exercised or applied, but are those that are "reasonably" exercised or applied. Negligence cannot be excused on the grounds that others practice the same kind of negligence. Medicine is not an exact science and the proper practice cannot be gauged by a fixed rule.

(Citations omitted.)

 Wyoming adheres to the majority position, known as the "traditional" or "professional" view, with respect to the required scope of disclosure. This standard provides that the physician is required to disclose only such risks that a reasonable practitioner of like training would have disclosed in the same or similar circumstances. 2 D. Louisell and H. Williams, *supra,* ¶ 22.07 at 22–28; 1 S. Pegalis and H. Wachsman, *supra,* § 2:15 at

98–99 (citing *Govin,* 374 P.2d 421); F. Rozovsky, *Consent to Treatment,* ch. 1C at 41 (1984). Under this standard, expert testimony is required to establish what a reasonable practitioner would disclose in the same or similar circumstances. *Stundon,* 469 P.2d at 21; *Govin,* 374 P.2d at 424; 2 D. Louisell and H. Williams, *supra* at ¶ 17B.10; 1 S. Pegalis and H. Wachsman, *supra* at § 2:15.[5]

 In order to overcome a motion for summary judgment, a plaintiff in a medical malpractice case must also present evidence, usually in the form of expert testimony, indicating the departure by a medical practitioner from a recognized standard of practice was a proximate cause of her injury. *Harris,* 625 P.2d 747. A plaintiff establishes proximate cause in an informed consent case by proof that proper disclosure would have resulted in a decision against the proposed treatment or procedure. 2 D. Louisell and H. Williams, *supra* at ¶ 22.14; F. Rozovsky, *supra* at § 1.13.4. Two approaches have evolved with respect to the appropriate test for measuring the causal connection in informed consent cases. The subjective test considers what the plaintiff would have done if the risks had been properly disclosed. This test has been criticized because the question of causation turns on the credibility of the hindsight of the person seeking recovery after an undesirable result and also because this test would probably preclude recovery if the patient had died as a result of the treatment received. The majority of jurisdictions, therefore, apply an objective test which focuses on what a reasonable person in the plaintiff's position would have done if the risks had been adequately disclosed. Under the objective test, the patient's hindsight testimony is relevant but not controlling. F. Rozovsky, *id.;* 2 D. Louisell and H. Williams, *supra* at ¶ 22.14; 1 S. Pegalis and H. Wachsman, *supra* at § 2:15, and cases cited therein. We think the majority approach, i.e., the objective test, is the better reasoned, and we herein adopt that test

5. An exception to the requirement that the plaintiff must establish the accepted standard of care by expert testimony arises only where the "asserted negligence consists of conduct so obviously wanting in reasonable medical skill and prudence that it may be so adjudged even by laymen." *Stundon,* 469 P.2d at 22, *quoted in Harris,* 625 P.2d at 752.

as the appropriate test for measuring causation in informed consent cases in Wyoming.

With the foregoing principles in mind, we look to the materials in the record to determine if genuine issues of material fact exist which would preclude the entry of summary judgment. In support of his motion for summary judgment, appellee submitted his own affidavit in which he stated that he was aware of the standard required for informed consent for dentists practicing his specialty, that he fully informed appellant of the risks associated with the apicoectomy on tooth # 20, including the risk of nerve damage, and further that this disclosure was accomplished by use of a diagram, a copy of which was attached to his affidavit.

Appellee also relied upon the affidavit of Dr. Giovale in which Dr. Giovale stated he was fully familiar with the standard of care required of dentists with regard to the disclosures necessary for informed consent in referral situations and that, prior to referring appellant to appellee for the apicoectomy on tooth # 20, he discussed with her the specific risks involved, including the possibility of nerve injury and paresthesia. Dr. Giovale attached to his affidavit a copy of his office charts with notations indicating he had apprised appellant of possible nerve injury and paresthesia on this occasion.

Appellee additionally submitted the affidavit of Dr. Joseph Devine, a Cheyenne, Wyoming, dentist. Dr. Devine stated he had reviewed appellant's dental records and other relevant materials in the record, including the pleadings, the affidavits of appellee and Dr. Giovale, and an outline of appellant's deposition. Dr. Devine said he was familiar with the applicable standard of care, although, as with the affidavits of appellee and Dr. Giovale, Dr. Devine did not delineate what the applicable standard of disclosure required under the circumstances. Thus, without stating what the standard of care required, Dr. Devine stated that, in treating appellant, appellee exercised that degree of care ordinarily possessed and exercised by dentists in good standing practicing in the community or elsewhere. With respect to the question of proximate cause, Dr. Devine stated: "[I]t is unreasonable to believe that a patient being fully informed would have elected any other procedure."

In opposition to the above materials, appellant submitted the affidavit of Dr. Boyd Tomasetti, a Colorado dentist and oral surgeon. Dr. Tomasetti stated that he had reviewed the relevant materials including the affidavits and appellant's dental records and that he had personally examined appellant. Dr. Tomasetti said he was familiar with the applicable standard of care relative to obtaining an informed consent for an apicoectomy. He then described the relevant standard:

That based upon my education, training and experience, it is my opinion that the standard of care applicable to Dr. Gregory F. Bell regarding obtaining an informed consent from Angelina Roybal to perform an apicoectomy on tooth no. 20 is as follows: a) The patient must be informed of the nature of the condition of tooth no. 20 prior to the procedure; b) The practitioner must, prior to the procedure, explain to the patient the more common risks and complications of the procedure, which risks and complications include: i) recurrent and chronic infection of the tooth and surrounding areas, ii) possible nerve damage, par[e]sthesia and hyperesthesia to the area of the tooth and the face, iii) potential loss of the tooth from failure of the treatment, and iv) possible damage to adjacent teeth requiring additional root canal treatment; c) The practitioner must, prior to the procedure, explain to the patient the options available to the patient in lieu of the apicoectomy which would be extraction of the tooth; d) The practitioner must make a written note in his charts or records that all of the above were reviewed with the patient by the practitioner and further the records or charts must reflect that the review was prior to the procedure; and e) The practitioner must, prior to the procedure, obtain a signed consent from the patient to perform the procedure * * *.

Dr. Tomasetti further opined that, on the basis of a review of appellee's records and charts, appellee did not comply with the requisite standard of care in obtaining an informed consent from appellant in the following particulars: failure to review with appellant the condition of the tooth prior to the procedure; failure to review with appellant prior to the procedure the more common risks and complications associated with the procedure; failure to review with appellant the options available; failure to inform appellant of the possible loss of the tooth; and failure to obtain a signed consent to the procedure. Finally, Dr. Tomasetti stated that it was reasonable to believe that a fully informed patient in appellant's position would have elected an alternative procedure.

Appellant additionally relied upon her own deposition testimony in opposing the summary judgment. In her deposition appellant stated that neither appellee nor Dr. Giovale made any specific disclosures as to the risks or possible complications associated with an apicoectomy on the occasion of the apicoectomy on tooth # 20 nor did they do so when she had the prior apicoectomy on the upper right side. Appellant further stated that, if the office records of appellee and Dr. Giovale indicate disclosure, the records are false. Appellant said that, had she been warned of the possible complications and problems, she would have refused the apicoectomy on tooth # 20 and would have opted initially for extraction.

■ Although we have described the materials submitted by appellant in opposition to the motion for summary judgment, we need not consider the sufficiency of such materials because we conclude that appellee failed to meet his initial burden of demonstrating the absence of a genuine issue of material fact. *See Metzger v. Kalke,* 709 P.2d 414 (Wyo.1985). The affidavits of appellee, Dr. Giovale, and Dr. Devine are defective in that each fails to state the prevailing standard of care by which to measure the adequacy of the consent obtained, if any. The standard of care must be stated with specificity sufficient to enable the court to determine if appellee

properly disclosed the risks and alternatives in conformance with the standard. *Hurtt v. Goleburn,* 330 A.2d 134 (Del.Supr. 1974). Because these supporting affidavits fail in this important respect, appellee, as movant, did not meet his initial burden of proving the nonexistence of a genuine issue of material fact.

■ Since appellee failed to properly support his motion for summary judgment, appellant was entitled to rely upon her allegation that she did not receive adequate information to enable her to give an informed consent, and she had no obligation to present any factual support for her allegation. *Petersen v. Campbell County Memorial Hospital District,* 760 P.2d 992 (Wyo.1988); *Metzger,* 709 P.2d 414; *Hurtt,* 330 A.2d 134. Her unrefuted allegation is sufficient to state a claim upon which relief can be granted, and the pleadings of the parties structure a question of fact as to appellee's alleged negligent failure to obtain informed consent. *Petersen,* 760 P.2d 992; *Metzger,* 709 P.2d 414.

We also note appellee's argument that the fact appellant had previously undergone a successful apicoectomy indicates her informed consent to the second procedure. We cannot agree with this proposition. We are unable to conceive how informed consent to a second surgery can be inferred from a successful prior procedure performed without informed consent, if such was the case.

Summary judgment was improvidently granted to appellee and cannot be sustained. Reversed and remanded for further proceedings.

URBIGKIT, J., filed a dissenting opinion.

URBIGKIT, Justice, dissenting.

This is a multi-dentist/multi-complaint lawsuit which was reformed fairly quickly into one charge against one dentist. Appellant claims now that appellee failed to advise her adequately that she could have had her tooth pulled in lieu of his efforts to try to save the tooth. The effort to save the tooth was a match to the same process

the dentist had performed successfully on another one of her teeth nine months earlier.

Appellant was no stranger to dental treatment when this course of events developed. Appellant first started dental treatment with Dr. Richard John Giovale, D.D.S. in May 1983 for repair of a bridge which was installed in the early 1960's as part of a multi-bridge installation.[1] From initial interview, treatments continued through more than twenty sessions to repair and replace bridges and cure the continuing complaints of pain. During this course of treatment, which extended from May 2, 1983 through April 1, 1986, appellant was twice referred to Dr. Gregory F. Bell, D.D.S., M.S.D. for the apicoectomy; first for tooth designated number two on July 31, 1984 and then for a second tooth, designated number twenty, on April 18, 1985. Following continued pain in that tooth, number twenty, which had been initially considered during the first interview in 1983 as painful, appellant was referred to Dr. Rex Dolan, D.D.S., who, in January 1986, pulled the tooth.

After leaving Wyoming, appellant returned to the state to file suit against all three dentists, which litigation remains today as her criticism of the intermediate dental treatment provided by Dr. Bell from contended failure to be furnished sufficient information for her informed consent to decide whether to undertake the second apicoectomy. In reality, what the case really means is that appellant, Angelina Roybal, claims failure to understand that she had a choice in July 1984 of extraction instead of continuing efforts for retention. That present contention is consistent with an original pleading change which she made against Dr. Giovale raising a failure of warranty claim. It belies a scintilla of evidence question, *Cordova v. Gosar*, 719 P.2d 625 (Wyo.1986), that the patient in 1985 did not realize that before the second apicoectomy was performed that she could have otherwise chosen extraction, since clearly the tooth had been continually causing her problems *during the entire period of treatment commencing with Dr. Giovale's first interview in May 1983.* Appellant elected to hope that like the benefit she received from the procedure on tooth number two, a similar result could be obtained on tooth number twenty and permit retention instead of extraction.

I dissent without conclusion that a written consent is not preferable, nor by ignoring current knowledge that dentistry has now joined the real world of litigation involving doctors, lawyers and accountants, which mandates detailed records and all-inclusive forms. Essentially, I do not disagree with the concise and accurate analysis of the law of informed consent provided by the majority.

Conversely and specifically, I do not find a viable question in the controversy in this case disclaiming that appellant was not informed and did consent to the second procedure. She knew what the procedure would be when she went to the other dentist's office and what would be done, as she both voluntarily went and submitted. I decline to unburden probabilities to adversely assess chances that she did not exactly, specifically and completely understand her three choices: do nothing, have the procedure, or pull the offending tooth. It is my conception and concern that we now substitute formula and formalism for actuality. It is in the concept of informed consent where this case is now postured that the well-established conceptualization of actuality occurs that there are three worlds: what I see, what you see and what actually is. Likewise in communication, there are three objective functions: what I intended to tell you, what you thought I meant and what the disassociated person

1. Appellant testified in deposition that the reason for her commencement of treatment with Dr. Giovale was a loose bridge.
Q. Were you having any pain when you first went to see him?
A. No.
Q. None at all?
A. No.
Dr. Giovale's initial interview records and comprehensive detail reveal a status absolutely to the contrary, since her pain is pervasively shown as the motivation for starting that sequence of dental treatment.

perceives to have been said or written without the overlay of association as its attribution for implied meaning.

Each lawyer involved and the practitioner in the healing arts should comprehensively consider the current Illinois law journal article, Twerski and Cohen, *Informed Decision Making and the Law of Torts: The Myth of Justiciable Causation,* 1988 U.Ill.L.Rev. 607 (1988). Undoubtedly, the fact that hope springs eternal cannot be ignored as a functioning psychological content of informed consent. The litigative corollary thereafter may appear that if success is not achieved, consent may have not been adequate because an undesired result would not have been willingly chosen.

As long as courts and scholars insist on measuring informed consent damages by focusing on the resultant personal injuries, they cannot escape the causation dilemma. In recognizing the essential nonjusticiability of this personal injury model for informed choice cases, we do not suggest that this genre of litigation be obliterated. Instead, we suggest a radical restructuring of the informed choice doctrine. Rather than focusing on personal injury damages flowing from the hypothetical "but for," which seeks to determine what the plaintiff would have decided had the defendant provided the information, we suggest that courts should identify and value the decision rights of the plaintiff which the defendant destroyed by withholding adequate information.

*Id.* at 608–09.

I conclude that this record reveals an alternative choice to pull or not to pull the tooth and nothing to suggest that appellant had inadequate information to make that choice. The travesty of what we do in many legal processes is to create fictions.[2] Here, that fiction is that a patient, by signing a form, is provided usable information for reasoned decision. I do not find the form, which was included in the mass of material submitted by appellant's expert witness, even minimally informative in making the choice whether appellant should continue treating the tooth or abandon hope and have it pulled. It is in the nature of the oral discussions between the health-care practitioner and the patient that can only provide a basis for realistic decision and not pro forma forms that mean nothing to either party in the real world of present choice with illness decisions immediately presented.

In the informed consent article earlier referenced, the authors remind us that matter of presentation predominates over what is said:

Everyone knows that "half-empty" and "half-full" have different connotations. Similarly, in many circumstances, descriptions of the risks of a medical procedure in terms of the chances of success or the chances of failure may have different connotations and lead to different decisions.

For example, consider the following problems presented to two groups of subjects by Professors Kahneman and Tversky. In the first problem, seventy subjects were told that, in addition to whatever they own, they have been presented with $1000. The subjects were then asked to choose between (a) a 50% chance of an additional $1000, and (b) a 100% chance of an additional $500. In the second problem, sixty-eight subjects were told that, in addition to whatever they own, they have been presented with $2000; they were then asked to choose between (a) a 50% chance of losing $1000, and (b) a 100% chance of losing $500.

A moments's reflection will reveal that the two problems are identical. In both problems, the subjects were asked to choose between (a) a gamble in which they had an even chance of ending up with either $1000 or $2000, and (b) a sure

---

**2.** Defined by dissent in *Andersen v. Corbitt,* 777 P.2d 48, 53, (Wyo.1989) (quoting Black's Law Dictionary 804 (5th ed. 1979)) as:

"Assumption of fact made by court as basis for deciding a legal question. A situation contrived by the law to permit a court to dispose of a matter, though it need not be created improperly; e.g. fiction of lost grant as basis for title by adverse possession."

$1500. Yet the preferences expressed by the two groups of subjects were far from identical. In the first problem, 84% of the subjects selected the sure $1500 ($500 in addition to the original $1000); 16% chose the gamble. In the second problem, however, only 31% chose the sure $1500 ($2000 minus $500); 69% chose the gamble.

Professors Kahneman and Tversky theorize that the explanation for the disparity between the two groups of subjects is that "people normally perceive outcomes as gains or losses, rather than as final states of wealth or welfare." Quite obviously, then, whether the risks of a medical procedure are framed as gains or losses could have a significant impact on the patient's choice.

An example of the framing phenomenon in the medical decision-making context is provided in a study by Professors McNeil, Pauker, Sox, and Tversky. The researchers asked subjects to imagine that they had lung cancer and to choose between surgery and radiation treatment based on the information presented to them. Identical outcomes were framed differently for different subjects: they told some subjects the range of possible outcomes in terms of the probability of living at various points (e.g., 68% chance of living for more than one year), while they told others the range of possible outcomes in terms of the probability of dying (e.g., 32% chance of dying by the end of one year).

The framing of the various results in terms of survival or mortality had a significant impact. On the average, subjects preferred radiation therapy to surgery 42% of the time when the information was presented in terms of the probability of dying, but only 25% of the time when information was presented in terms of the probability of living.

Twerski and Cohen, *supra,* 1988 U.Ill.L. Rev. at 634–35 (quoting Kahneman & Tversky, *Prospect Theory: An Analysis of Decision Under Risk,* 47 Econometrica 263, 273 (1979)) (footnotes omitted).

After an analysis of functions of the thinking process and the reasoning capaci-

ty, the authors, in consideration of aspects in the functionality of reasoning, including illogical processing of information—under utilization of base rate information—assessing multiple risks or availability—manner of presentation invoking framing effects—anchoring and primacy, as accentuated by the effect of prior idiosyncratic information, conclude:

> Unquestionably, the legal system's insistence on determining the hypothetical results of a hypothetical decision-making process incorporates so much uncertainty that its credibility is minimal. Accordingly, determinations about decision causation in the informed choice arena can only be made by blinding ourselves to the complexities inherent in the process. The uncertainties are so great, and the margin for error so small, that any judgment, either way, cannot be made with any confidence.

Twerski and Cohen, *supra,* 1988 U.Ill.L. Rev. at 641.

All of this returns in application for this case to the factual totality that the real question involved was since it worked on tooth two, shall we try and see if similar success will occur with tooth twenty? *Cf.* Comment, *Torts—Informed Consent—Informed Consent is Determined by Prudent Patient Rather Than Reasonable Physician Standard. Largey v. Rothman,* 110 N.J. 204, 540 A.2d 504 (1988), 20 Rutgers L.J. 837 (1989).

The summary judgment decision of the trial court should be related dispositively to this case and appellant's decision to continue to try to save the pain producing tooth (on employer provided insurance). The affidavit of appellant's expert encouraging greater documentation convinces me that formalism without effective function in decision may be required for the law, but provides nothing for medicine.

We return in concept in this case to analyze whether a form, which would have been helpful as evidence but perhaps communicatively meaningless in medicine, must be required in law. I am satisfied that our tests of *Govin v. Hunter,* 374 P.2d

421 (Wyo.1962) and *Stundon v. Stadnik*, 469 P.2d 16 (Wyo.1970), developed generally in *Vassos v. Roussalis*, 625 P.2d 768 (Wyo.1981) and *Kobos By and Through Kobos v. Everts*, 768 P.2d 534 (Wyo.1989), are fulfilled in justification of the summary judgment granted. My reverse concern is formalistic reliance on which we can easily provide an inadequate foundation for the patient to make the thoughtful decision constituting "informed consent." Having a heart by-pass or commencing chemotherapy may require expert assistance for the patient to assess the risk-benefit ratio which is the quantum of choices that life provides. However, the go or no go in tooth extraction cannot, I believe, fit under that umbrella of informational need.

I would affirm.