**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 12 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENItenth CIRCUIT

---

JOSEPH E. NALDER and MICHELLE
NALDER, individually and as parents
and natural guardians for Blake A.
Nalder,

      Plaintiffs - Appellants,

v.

WEST PARK HOSPITAL; RAND E.
FLORY, M.D.; CHARLES E.
JAMIESON, M.D.,

      Defendants - Appellees.

No. 99-8081

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 98-CV-52-J)**

---

Roy A. Jacobson, Jr. (R. Daniel Fleck and Laura N. MacPherson with him on the briefs), Spence, Moriarity & Schuster, LLC, Jackson, Wyoming, for Plaintiffs-Appellants.

Michael K. Davis (Jay A. Gilbertz, Yonkee and Toner, Sheridan, Wyoming, Corinne E. Rutledge and Kevin C. Cook, Lathrop and Rutledge, P.C., Cheyenne, Wyoming, Robert M. Shively and Amy M. Taheri, Shively Law Offices, P.C., Casper, Wyoming, with him on the brief), Yonkee and Toner, Sheridan, Wyoming, for Defendants-Appellees.

---

Before **BALDOCK**, **POLITZ**,[*] and **LUCERO**, Circuit Judges.

_____

**LUCERO**, Circuit Judge.

_____

Plaintiffs-appellants Joseph ("Blue") Nalder and Michelle Nalder brought an action against defendants-appellees West Park Hospital, Rand Flory, M.D., and Charles Jamieson, M.D., alleging medical malpractice after their son, Blake, suffered brain damage near the time of his birth. A twenty-day trial resulted in a verdict for defendants. Plaintiffs seek a new trial, claiming the district court erred by ordering plaintiffs to strike two expert witnesses, permitting one of defendants' expert witnesses to testify to an opinion not disclosed before trial, and excluding certain documents. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

**I**

While pregnant with Blake in 1996, Michelle was cared for by Dr. Flory, an obstetrician. Despite some risk for premature labor and rapid delivery, Michelle's pregnancy appeared normal and she proceeded to full term. When she was thirty-eight-and-a-half weeks pregnant, Michelle awoke in the middle of the night and noticed she was bleeding. Either she or her husband called Dr. Flory,

_____

[*] The Honorable Henry A. Politz, Circuit Judge for the United States Court of Appeals for the Fifth Circuit, sitting by designation.

who advised Michelle to go to West Park Hospital, which was about twenty-six miles from the Nalders' home. While en route to the hospital, Michelle began experiencing contractions and was in full labor by the time she arrived.

Because West Park Hospital is locked at night (due to security concerns stemming from its small size and rural location), it took a few minutes for Michelle and Blue to get inside. Michelle was brought to a birthing room. Although birth was imminent at this point, the nurses asked Michelle to refrain from pushing while they called for a doctor to assist with the birth and gathered necessary equipment.

The parties dispute the exact timing of the various events surrounding Blake's birth, but it is undisputed that Blake's head was born very soon after the Nalders entered the hospital—within fifteen minutes. Blake's head was born with the membranes intact and a triple nuchal cord and nuchal hand, meaning that the umbilical cord was coiled around his neck three times with his hand entwined in the cord. In addition, the umbilical cord had only one artery and one vein, instead of the two arteries and one vein in a normal umbilical cord. These aspects of the birth required the nurses to rupture the membranes, suction Blake's nose and mouth, and unwrap the nuchal cord, resulting in some delay between the birth of Blake's head and the rest of his body. When fully delivered, Blake was not breathing.

Shortly after Blake was born, Dr. Flory arrived and noted that Blake's heart rate was dangerously low. The nurses present began resuscitation efforts and ventilated Blake with a bag valve mask. Blake's heart rate slowly increased over the next ten minutes and he began to breathe on his own. At this point, ventilation was discontinued, and Blake was placed under a small oxygen tent.

About ten minutes after Blake's birth, a nurse called Dr. Jamieson, a pediatrician, as was usual when a newborn was not doing well. Dr. Jamieson arrived about thirty-six minutes later, ordered various tests, and eventually weaned Blake off supplemental oxygen. The next day, Blake began experiencing seizures. Dr. Jamieson ordered further tests and eventually prescribed medication to control the seizures. After consulting with a pediatric neurologist, Dr. Jamieson decided it was not necessary to transfer Blake to a tertiary care center.

Blake, now age four, is blind, cannot talk, walk, crawl, roll over, or hold up his head. He has cerebral palsy, spastic quadriplegia, and an uncontrolled seizure disorder. He is fed through a tube and is completely dependent on others for every aspect of his care. As a result of these birth defects, the Nalders brought this diversity action against Drs. Flory and Jamieson and West Park Hospital for medical malpractice. The parties agree that Blake's condition is the result of severe brain damage caused by oxygen and/or blood flow deprivation that occurred near the time of his birth. This deprivation occurred because

Blake's umbilical cord was compressed, cutting off the flow of oxygen and blood. The parties disagree over the timing of the injuries and whether they were caused, or could have been avoided, by defendants. As succinctly stated by defendants,

> [t]he principal questions at trial were whether Blake's injury was caused by cord compression which occurred as the result of medical negligence, or whether it was the result of a condition which could not have been prevented by the exercise of reasonable medical care. The other issues were whether Blake was properly resuscitated and whether he was properly cared for afterwards.

(Appellees' Br. at 15.)

In Wyoming, "[a] medical malpractice plaintiff has the burden to prove (1) the accepted standard of medical care or practice, (2) that the doctor's conduct departed from the standard, and (3) that his conduct was the legal cause of the injuries suffered." Sayer v. Williams, 962 P.2d 165, 167–68 (Wyo. 1998) (quotation and citations omitted). To meet their burden, plaintiffs sought to use numerous expert physician witnesses. For our purposes, four of plaintiffs' expert witnesses are important. Plaintiffs sought to designate:

(1) Dr. Ian Donald, an obstetrician, to testify about the standard of care required of an obstetrician, like Dr. Flory, who practices in a rural community and that Dr. Flory's care fell below that standard;

-5-

(2) Dr. Barry Schifrin, an obstetrician and perinatologist (a specialist in high-risk pregnancy), to testify that Dr. Flory's care and treatment at the time of Michelle's labor and delivery caused Blake's brain damage;

(3) Dr. Stephen Luber, a pediatrician, to testify about the standard of care required of a pediatrician, like Dr. Jamieson, who practices in a rural community and that Dr. Jamieson's care fell below that standard;

(4) Dr. Jeffrey J. Pomerance, a pediatrician and neonatologist (a specialist in the care of newborn babies), to testify regarding the causation of Blake's injuries and how transfer to a tertiary care facility would have improved his quality of life.[1]

Defendants requested an order requiring plaintiffs "to choose only one of their duplicative experts in the fields of Pediatrics and Obstetrics." (II Appellants' App. at 451.) Reasoning that plaintiffs' expert witnesses were duplicative because all perinatologists are obstetricians and all neonatologists are

---

[1] Plaintiffs acknowledge that their initial designation of these four witnesses created some overlap of the proffered testimony of Drs. Donald and Schifrin (the two obstetricians) and Drs. Luber and Pomerance (the two pediatricians). Attempting to correct the admitted overlap in their initial designation, plaintiffs filed a "Motion to Clarify or Reconsider Order Ruling on Defendants' Motion to Strike Plaintiffs' Duplicative Experts" along with a proposed redesignation of the witnesses' testimony that plaintiffs argued deleted the overlapping portions of the original designation. (II Appellants' App. at 612 to 620-31.) The description of the proffered testimony discussed in the text reflects the amended designations offered by plaintiffs.

pediatricians, a magistrate judge granted defendants' request and ruled that "Plaintiffs shall elect either Dr. Luber or Dr. Pomerance, but not both and shall also elect either Dr. Donald or Dr. Schiffrin [sic], but not both." (Id. at 627.) The district judge affirmed the magistrate judge's ruling, citing D. Wyo. Local Civ. R. 26.1(e)(1), which states that "[t]he parties are limited to the designation of one expert witness to testify for each particular field of expertise." Plaintiffs chose Drs. Luber and Donald.

A crucial issue at trial was the timing of the oxygen deprivation that caused Blake's injuries. One of plaintiffs' expert witnesses, Dr. Richard Naeye, addressed this subject at trial, testifying that nucleated red blood cells ("NRBCs") appear in placental blood within twenty to twenty-five minutes after an hypoxic event. Because there were no such cells in Blake's placenta, Dr. Naeye concluded that Blake could not have been oxygen-deprived prior to arriving at West Park Hospital and that the hypoxic event must have occurred so near the time of birth that NRBCs had not yet developed. Over objection, defendants' expert witness, Dr. Rebecca Baergen, testified in rebuttal that NRBCs usually take twelve hours to appear and that the absence of NRBCs was thus consistent with an hypoxic event that occurred many hours before Blake's birth.

The day Blake was born, the Director of Obstetric Nursing at West Park Hospital, Darlene Farren, held a meeting to discuss the Nalder case. Farren made two pages of handwritten notes during the meeting. After conducting an <u>in camera</u> inspection and hearing testimony from Farren outside the presence of the jury, the district judge ruled that these notes were protected from disclosure pursuant to Wyoming's privilege for professional standard review organizations. <u>See</u> Wyo. Stat. Ann. §§ 35-17-101, 35-17-105.

The case was tried to a jury from June 28, 1999, to July 26, 1999. At the conclusion of the trial, the jury found that none of the defendants was negligent (i.e., each met the appropriate standards of care). Because the jury did not find any of the defendants negligent, there was no need to consider whether any of the defendants' actions caused Blake's injuries. Plaintiffs now request a new trial based on the district court's alleged erroneous rulings concerning plaintiffs' and defendants' expert witnesses and the court's application of the Wyoming privilege for professional standard review organizations.

## II

We review a district court's decisions regarding the exclusion or admission of expert testimony for an abuse of discretion. <u>See</u> <u>City of Hobbs v. Hartford Fire Ins. Co.</u>, 162 F.3d 576, 586 (10th Cir. 1998); <u>United States v. Barbee</u>, 968 F.2d 1026, 1031 (10th Cir. 1992). This standard of review encompasses

decisions based on the application of local court rules. See Hernandez v. George, 793 F.2d 264, 266 (10th Cir. 1986). While district judges have broad discretion to exclude expert witnesses, they may not do so "arbitrarily, or on the basis of mere numbers." Green Constr. Co. v. Kan. Power & Light Co., 1 F.3d 1005, 1014 (10th Cir. 1993).

Under the abuse of discretion standard of review, "[w]e must carefully scrutinize the district court's exercise of its discretion." Kiowa Indian Tribe of Okla. v. Hoover, 150 F.3d 1163, 1165 (10th Cir. 1998). However, "we may not . . . substitute our own judgment for that of the trial court," id. (alteration in Kiowa) (quotation and citation omitted), and cannot reverse unless we have "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances," McEwen v. City of Norman, 926 F.2d 1539, 1553–54 (10th Cir. 1991). "An abuse of discretion will be found only where the trial court makes an arbitrary, capricious, whimsical, or manifestly unreasonable judgement." FDIC v. Oldenburg, 34 F.3d 1529, 1555 (10th Cir. 1994) (quotations and citations omitted).

## A

In requiring plaintiffs to strike two of their expert witnesses, both the magistrate judge and the district judge determined that the proffered experts would present "unnecessary duplication of expert testimony." (II Appellants'

App. at 626, 686.)  While plaintiffs admit their original designation of experts did contain duplication, they point out that neither ruling addressing their revised designation notes any specific duplicative testimony.  Instead, both orders apparently find duplication in the mere fact that Drs. Donald and Schifrin are both obstetricians and that Drs. Luber and Pomerance are both pediatricians. (See id. at 626 ("Plaintiffs go to great length to explain to the Court that an obstetrician is not a perinatologist but fails [sic] to address the inverse that the perinatologist, Dr. Schiffrin [sic], is also an obstetrician."), 686 ("[P]laintiffs have listed designations of two experts in each field of expertise, suggesting that the sub-specialties of each of the experts constitute separate fields of expertise. The Court disagrees . . . .").)

We have several concerns about these decisions.  Most importantly, they point to nothing other than overlapping qualifications of plaintiffs' experts and the mere possibility that duplicative testimony could result.  Our review satisfies us that plaintiffs took care to compartmentalize the areas of testimony of each of their expert witnesses and that plaintiffs' amended expert designations thus contain little or no actual overlap of the experts' proffered testimony—and certainly not enough to support a blanket prohibition.  In addition, aside from broad generalities, neither the magistrate judge, the district judge, nor defendants

point to any specific overlapping or cumulative testimony in plaintiffs' amended designation.[2]

We also disagree with the district judge's application of D. Wyo. Local R. 26.1(e)(1). According to the district judge, sub-specialties (e.g., neonatology and perinatology) are not really separate fields of expertise and plaintiffs' designation of multiple experts thus runs afoul of the rule's requirement of only one expert in each "particular field of expertise." That view ignores the complex causation issues in this case that necessitate expert witnesses with narrow, specialized areas of expertise to opine on the causes of Blake's injuries. The importance of having sub-specialists testify was highlighted by defense counsel's questioning of plaintiffs' expert, Dr. Donald, to point out that he was only an obstetrician and did not possess a sub-specialty in perinatology. Presumably, counsel would not have asked these questions if such sub-specialization were not an important qualification.

---

[2] This is especially striking on the part of defendants. They provided a detailed chart comparing the overlapping portions of testimony in plaintiffs' original expert designation but were unable to do so at any time after plaintiffs amended their expert designation. We also note defendants' assertion in their brief that the magistrate judge's "carefully considered Order shows that Nalders' experts were not excluded arbitrarily or on the basis of mere numbers, or solely on the basis of District Court Rule 26.1(e)(1)" refers to the order addressing plaintiffs' original designation, rather than the two relevant orders—those addressing plaintiffs' amended designation. (Appellees' Br. at 31–32 (citing II Appellants' App. at 610).)

Finally, we note that defendants, unlike plaintiffs, were able to call a perinatologist and a neonatologist to testify regarding causation and, in addition, called defendants Drs. Flory and Jamieson, who testified regarding the applicable standards of care. As a result, defendants never had to choose between causation and standard of care expert witnesses.

Despite these problems, we cannot say that the decision was "arbitrary, capricious, whimsical, or manifestly unreasonable." Dodoo v. Seagate Tech., Inc., 235 F.3d 522, 528 (10th Cir. 2000) (quoting Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 992 (10th Cir. 1999)). Perhaps most important is the simple reality that the district court's order did not prevent plaintiffs from calling five expert witnesses, three of whom testified about the causation of Blake's injuries: (1) a pediatric neurologist; (2) a pediatric neuroradiologist; and (3) a placental pathologist. From these witnesses, the jury heard testimony that Blake's injuries occurred within twenty-five minutes of his birth. According to plaintiffs' version of the facts, Blake was born within twenty to twenty-five minutes of his parents' arrival at West Park Hospital. At trial plaintiffs alleged numerous problems with the care provided by defendants from the time they arrived at West Park Hospital until (and after) Blake's birth. (See Appellants' Br. at 9–17 (alleging a several minute delay in allowing the Nalders into the hospital, failure to notify proper medical staff and assemble a medical

team with the necessary experience, violation of hospital policies, and breaches of the standard of care).) Thus, contrary to plaintiffs' position that their case was completely undermined by the district court's decision requiring exclusion of experts, the jury heard both a theory of causation and factual allegations that, taken together, placed Blake and his mother under the substandard care of defendants for virtually the entire window of time that Blake could have suffered his injuries.

In addition, although the district judge's order gave plaintiffs the option of calling their perinatologist and neonatologist, plaintiffs chose instead to call Drs. Donald and Luber, who were qualified only in the more general categories of obstetrics and pediatrics. Plaintiffs defend this choice by arguing that Drs. Donald's and Luber's "qualifications as rural practitioners" were "needed to establish a breach of the standard of care." (Id. at 48.) While a medical malpractice plaintiff bears the burden of establishing "the accepted standard of medical care or practice," Sayer, 962 P.2d at 167–68, plaintiffs misunderstand the nature of that burden. Implicit in plaintiffs' assertion—which lacks citation to any legal authority whatsoever—is an apparent belief that Wyoming clings to the "locality rule" for demonstrating the applicable standard of care. As the magistrate judge pointed out, "Wyoming applies a standard of care requiring nationally board certified physicians [such as the defendant doctors in this case]

-13-

to conform to a 'standard of care adhered to by that national board or association.'" (II Appellants' App. at 626–27 (quoting Wyo. Stat. Ann. § 1-12-601(a)(i)).)

The magistrate judge's view is borne out by several Wyoming Supreme Court cases that have "moved away from strict adherence to the 'locality' rule." Roybal v. Bell, 778 P.2d 108, 112 (Wyo. 1989); see also Moore v. Lubnau, 855 P.2d 1245, 1249 (Wyo. 1993) ("Wyoming has moved away from the locality rule in the field of medical malpractice."); Vassos v. Roussalis, 658 P.2d 1284, 1288 (Wyo. 1983) ("This court . . . indicated that a strict adherence to the so-called 'locality rule' was no longer necessary in the determination of the standard of care owed by physicians in medical malpractice cases; we continue to so hold."); Vassos v. Roussalis, 625 P.2d 768, 772 (Wyo. 1981) ("The skill, diligence, knowledge, means and methods are not those 'ordinarily' or 'generally' or 'customarily' exercised or applied, but are those that are 'reasonably' exercised or applied. Negligence cannot be excused on the grounds that others practice the same kind of negligence."). A commentator summarized the standard of practice in jurisdictions like Wyoming that have moved away from the locality rule:

> The growing majority of jurisdictions employ some variation of the national standard of care: a physician has a duty to employ the same reasonable diligence, skill, competence, and prudence as a minimally competent practitioner in the same general specialty, without regard to whether the care is delivered in an urban or rural setting.

-14-

Mary Anne Bobinski, Autonomy and Privacy: Protecting Patients from Their Physicians, 55 U. Pitt. L. Rev. 291, 310 (1994).

Properly viewed, plaintiffs' burden in establishing the standard of care requires only testimony regarding what a reasonable board certified obstetrician and pediatrician would have done in defendants' situations. Plaintiffs' perinatologist and neonatologist were board certified in obstetrics and pediatrics, respectively, and could have provided the necessary testimony establishing the national standard of care for such doctors.[3] Because the district court's decision permitted plaintiffs to call experts who could testify regarding both causation and the standard of care, we agree with defendants that plaintiffs "apparently made a tactical decision that they now regret." (Appellees' Br. at 30.)

Even were we to conclude that the decisions requiring plaintiffs to strike two experts constituted an abuse of discretion, plaintiffs have failed to demonstrate any prejudice to their case. Although plaintiffs called the experts they believed were qualified to testify regarding standard of care, the jury found for defendants on this issue and never reached the issue of causation. Thus, plaintiffs lost on the issue their experts could best address and the jury never

---

[3] Plaintiffs indicate that Dr. Schifrin had not practiced in general obstetrics for many years and that the same was true of Dr. Pomerance's practice in general pediatrics. Nevertheless, both remain board certified in those areas, and that qualification appears to be all that is necessary to testify regarding the applicable standard of care under Wyoming law. See Wyo. Stat. Ann. § 1-12-601(a).

reached the issue on which plaintiffs were hamstrung. Any error was harmless, and under these circumstances we will not set aside the jury's verdict. See Hinds v. Gen. Motors Corp., 988 F.2d 1039, 1048 (10th Cir. 1993) ("The effect on the jury of [excluded] evidence can only be prejudicial if it can be reasonably concluded that with . . . such evidence, there would have been a contrary result."); see also Fed. R. Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected.").[4]

**B**

NRBCs appear in response to an oxygen-deprivation (hypoxic) event. Although the parties agree that Blake's injuries are the result of an hypoxic

---

[4] Plaintiffs dispute this interpretation of the prejudice issue by noting that defendants' theory of causation "focused on time periods prior to the [alleged] standard of care violations" (Appellants' Reply Br. at 4), and conclude that the absence of plaintiffs' two causation experts meant "the jury never even had to consider whether any one Defendant breached the standard of care" (id. at 5). This argument simply ignores a large portion of plaintiffs' own case. Dr. Donald's expert designation alleges numerous violations of the standard of care during pre-natal treatment months before Michelle arrived at West Park Hospital for Blake's birth. (See II Appellants' App. at 632–34 (alleging that Dr. Flory did not conduct necessary ultrasound examinations, "failed to recognize [Michelle's] pregnancy as high risk for premature labor and . . . rapid labor," "failed to devise a proper back-up plan to deal with a potential rapid labor and delivery," and failed to conduct other tests, perform other examinations, and investigate other potential areas of concern).) As a result of these allegations, the jury necessarily considered, at the very least, whether Dr. Flory breached the standard of care long before Blake was born.

event, the blood from his placenta lacked NRBCs. The parties presented expert witnesses with divergent explanations for this phenomenon. Plaintiffs' expert witness, Dr. Naeye, testified that NRBCs take about twenty-five minutes to appear after an hypoxic event, and concluded that due to the absence of NRBCs in Blake's placenta, he was "certain" that "there was no brain damage or hypoxia prior to 25 minutes before birth." (IV Appellees' App. at 908.) The implication of Dr. Naeye's testimony was that Blake's injuries occurred while he was under defendants' care.

Defendants' witness, Dr. Baergen, testified that the absence of NRBCs was not an indication that Blake's injuries had occurred within twenty-five minutes of his birth. She explained that there were two alternative explanations for the lack of NRBCs. On the one hand, she testified that NRBCs take much longer than twenty-five minutes to appear—at least six hours and usually about twelve hours. Thus, Dr. Baergen believed the hypoxic event could have occurred many hours before Michelle arrived at West Park Hospital and NRBCs would not have had time to form. On the other hand, NRBC levels return to normal sometime after an hypoxic event. If Blake's injuries occurred "two, three, four, maybe more days prior to delivery," then "the nucleated red blood cell count would not be elevated at the time of delivery." (IV Appellants' App. at 1314.) Either theory

explained the lack of NRBCs in a way consistent with defendants' view that Blake's injuries occurred before his birth.

Citing Fed. R. Civ. P. 26(a)(2), plaintiffs argue that Dr. Baergen's testimony regarding the timing of NRBCs should not have been admitted because it was not disclosed in her pretrial expert witness designation. Rule 26(a)(2)(B) addresses expert testimony and requires disclosure of "a complete statement of all opinions to be expressed and the basis and reasons therefor" and "the data or other information considered by the witness in forming the opinions." These required disclosures encompass "evidence . . . intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(C).

Plaintiffs largely base their request for a new trial on Smith v. Ford Motor Co., 626 F.2d 784 (10th Cir. 1980). In Smith we outlined four factors for determining whether the district court abused its discretion in admitting expert testimony. Applying those factors to an allegation of a Rule 26 violation, we examine:

> (1) the prejudice or surprise in fact of the party . . . , (2) the ability of that party to cure the prejudice, (3) the extent to which [the Rule violation] would disrupt the orderly and efficient trial of the case . . . , and (4) bad faith or willfulness in failing to comply with the [Rule].

Smith, 626 F.2d at 797 (quoting Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904–05 (3d Cir. 1977)); see also Hynes v. Energy W., Inc., 211 F.3d 1193, 1203 (10th Cir. 2000) ("[W]hen a party requests a new trial on the basis of surprise testimony it must be able to show surprise, prejudice, and an attempt to cure the prejudice such as a motion for a continuance." (quoting Marino v. Otis Eng'g Corp., 839 F.2d 1404, 1411 (10th Cir. 1988))); Moss v. Feldmeyer, 979 F.2d 1454, 1459–60 (10th Cir. 1992) (applying the Smith factors to the district court's decision allowing an expert medical witness to expand his testimony the morning of trial).

After careful review of the record,[5] we conclude that plaintiffs have failed to demonstrate significant surprise or prejudice. Defendants repeatedly informed plaintiffs that Dr. Baergen's testimony would include criticisms of Dr. Naeye's trial testimony. And there was no mystery about a central aspect of her critique: Dr. Naeye believed that the lack of NRBCs in Blake's placenta was crucial evidence pinpointing the timing of Blake's injuries, while Dr. Baergen attached no significance to the lack of NRBCs. As she explained during her deposition—which was consistent with her trial testimony—a source of this disagreement was Dr. Baergen's concern about assumptions that went into Dr.

---

[5] We grant "Appellant[s'] Motion for Leave to Submit a Supplemental Appendix."

-19-

Naeye's studies on the timing of NRBCs. In particular, Dr. Baergen believed that Dr. Naeye's studies used unreliable indicators to determine the start of an hypoxic event. That mistake would necessarily distort his measurements of the time it takes for NRBCs to appear. Moreover, Dr. Baergen had an independent basis for her view that the low NRBC levels were insignificant. She testified that Blake's injury could have occurred so long before his birth that NRBC levels would have risen and then returned to normal. In that case, the dispute over whether NRBCs take twenty minutes or twelve hours to appear would have been immaterial.

Factors two and three are somewhat related in the context of this case. Significantly, plaintiffs' counsel never cross-examined Dr. Baergen in any way about her view concerning the general consensus on NRBC timing, other than one question asking if she had performed any relevant studies herself.[6] Nor did he request a continuance, which likely would have been possible because Dr. Baergen's trial testimony was presented by means of a videotaped deposition conducted outside the presence of the jury. A continuance in that situation would

---

[6] Plaintiffs do not suggest that the failure to cross-examine Dr. Baergen was a tactical decision or a matter of trial strategy. Instead, they simply claim they were "completely unable to cross-examine" her because their expert, Dr. Naeye, had returned to his home in Pennsylvania and because of the "difficulties of exploring the scientific literature in Wyoming." (Appellants' Reply Br. at 26.) We are unpersuaded by this argument.

have been much less disruptive of the "orderly and efficient trial of the case," Smith, 626 F.2d at 797, than if Dr. Baergen were testifying live before the jury. Thus, plaintiffs never made what likely would have been a successful attempt to cure (or at least mitigate) the alleged prejudicial impact of Dr. Baergen's testimony.

Finally, we discern no bad faith on the part of defendants. They could—and probably should—have done a better job providing the basis for Dr. Baergen's view about the consensus in the scientific literature concerning timing of NRBCs. Nevertheless, the central theme of Dr. Baergen's testimony was consistent both before and during the trial: Dr. Naeye's studies miscalculated the timing of NRBCs, which in turn led him to attach misplaced significance to the lack of NRBCs in Blake's placenta. In any event, this factor is of negligible importance because the district court made no finding of bad faith. See id. at 799. In addition, we have "question[ed] whether bad faith or willfulness has an application to this issue. . . . The issue, on appeal, must be analyzed from the point of view of the prejudiced party, not vice versa." Id. at 799–800.

**III**

We review a district court's application of an evidentiary privilege for an a abuse of discretion. See Frontier Refining, Inc. v. Gorman-Rupp Co., 136 F.3d 695, 699 (10th Cir. 1998). "In this context, however, we review the court's

underlying factual determinations for clear error and review de novo purely legal

questions." Id. Our examination of this issue is guided by "defer[ence] to the

trial court's judgment because of its first-hand ability to view the witness or

evidence and assess credibility and probative value," In re Grand Jury Subpoenas,

906 F.2d 1485, 1488 (10th Cir. 1990), and a "general[] reluctant[ance] to

overturn evidentiary rulings of the trial court," Messina v. Kroblin Transp. Sys.,

Inc., 903 F.2d 1306, 1310 (10th Cir. 1990).

Several weeks before the trial, defendants gave plaintiffs a privilege log

indicating that "[a] nursing quality assurance meeting was held relating to the

delivery of Blake Nalder" on the day he was born, but that "the substance of any

discussions at said meeting and the notes taken by [OB Nurse Manager] Darlene

Farren are confidential, privileged, and not subject to discovery pursuant to

Wyoming Statute[] . . . § 35-17-105." (II Appellants' App. at 803–04.) That

statute protects from disclosure "[a]ll reports, findings, proceedings and data" of

"professional standard review organizations." Wyo. Stat. § 35-17-105; see also

id. § 35-17-101 (defining terms). In response to a pretrial motion, the district

court reviewed the notes in camera and ruled that they were not privileged and

should be produced to plaintiffs.[7] Defendants moved for reconsideration, and the

_____

[7] We note that the district court's procedure comports with Wyoming
Supreme Court precedent requiring an in camera inspection of documents claimed
(continued...)

court conducted a hearing outside the presence of the jury at which Farren testified—and was cross-examined by plaintiffs' counsel—regarding the nature of the meeting and the notes. Her testimony apparently changed the district judge's mind, causing him to rule that the notes were privileged because they were created pursuant to "an investigation conducted as part of [Farren's] job, not only to supervise the nurses but to prepare notes for her formal report to the OB Peds committee, which I find does meet the definition in [§ 35-17-101]." (I Appellees' App. at 141–42.)

Plaintiffs contend that the meeting and Farren's notes do not bear sufficient indicia of formality to qualify as the "reports, findings, proceedings and data" of a "professional standard review organization[]" as those terms should be understood in Wyo. Stat. Ann. §§ 35-17-101 and 35-17-105. Instead, plaintiffs view the meeting as an "ad hoc" "'let's get the story straight' meeting." (Appellants' Br. at 55, 57.)

After reviewing Farren's testimony, we are confident that the district judge did not abuse his discretion in ruling that Farren's notes were privileged. Farren was a member of West Park Hospital's OB/Peds committee, which "reviews the nursing care as well as medical care, the policies and procedures which the OB

_____

$^{7}$(...continued)
to be privileged. See Hartson v. Campbell County Mem'l Hosp., 913 P.2d 870, 876–77 (Wyo. 1996).

department works under, . . . reports to the hospital Quality Assurance committee," and makes "recommendations for the handling of patient care issues." (I Appellees' App. at 127.) Her responsibilities included "routinely" "gathering information about an obstetric emergency"—such as Blake's birth—to make sure that West Park's "policies do, in fact, work. And if there is a problem, . . . mak[ing] recommendation[s] to revise policies as needed." (Id. at 127–28.) Farren's notes were made to assist preparing a formal report to the OB/Peds committee to help improve patient care.

Given these facts, Farren's notes fit squarely within the privilege in Wyo. Stat. Ann. § 35-17-101. That statute applies to any "committee of a medical staff in a hospital having the responsibility of evaluation and improvement of the quality of care rendered in the hospital," Wyo. Stat. Ann. § 35-17-101, and covers "those documents produced by the committee as notes, reports and findings in the review process," Hartson v. Campbell County Mem'l Hosp., 913 P.2d 870, 875 (Wyo. 1996) (quoting Greenwood v. Wierdsma, 741 P.2d 1079, 1089 (Wyo. 1987)). There is no "formality" requirement in the statute. Farren was a member of a committee that reviewed obstetrical emergencies and made recommendations to improve care. Her testimony, which the district judge credited, was that she wrote her notes as part of the process of reviewing patient

care at West Park Hospital, something she did "routinely" as a member of the OB/Peds committee.

We are aware that the privilege at issue is not so broad as to encompass any document reviewed by professional standard review organizations. See Wyo. Stat. Ann. § 35-17-105 ("[I]nformation, documents, or other records otherwise available from original sources are not to be construed as immune from discovery or use in any civil action merely because they were presented during proceedings of the organization . . . ."). Nevertheless, Farren's testimony demonstrates that applying the privilege in this case is proper because her notes were part of the process of reviewing and improving patient care at West Park Hospital. This is not an instance, as plaintiffs contend, where documents are claimed to be privileged merely because they passed before the eyes of a professional standard review organization.

**IV**

The judgment of the district court is **AFFIRMED**.